## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. 10-CR-376 |
| v. | ) | |
| | ) | Judge Robert M. Dow, Jr. |
| THOMAS ZAJAC | ) | |

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on various evidentiary and expert-related pretrial motions filed by Defendant Thomas Zajac ("Defendant"). For the reasons that follow, motions [221] and [317] are granted in part and denied in part. Motions [188], [190], [203], [212], [217], [299], [302], [304], [326], [332], [336], [337], [341], [349], [380], [401], [470], [500], and [549] are denied. The Court defers ruling on and requests that the Government file a supplemental brief by July 10, 2020 addressing motions [191], [286], [306], [331], [334], [335], and [504], as explained in this order. Defendant shall have until August 7, 2020 to file a reply. This case remains set for status on July 8, 2020 at 10:00 a.m. and for trial on November 16, 2020.

## I.      Background

On May 6, 2010, a grand jury returned an indictment against Defendant charging him with damaging property of the Hinsdale Metra Station in Hinsdale, Illinois by means of an explosive, in violation of 18 U.S.C. § 844(i) (Count One); using a destructive device during and in relation to a crime of violence, in violation of 18 U.S.C. §§ 924(c)(1)(A) and 924(c)(1)(B)(ii) (Count Two); possessing an unregistered destructive device in violation of 26 U.S.C. § 5861 (Count Three); and threatening to kill, injure, and intimidate individuals and unlawfully to damage and destroy real and personal property by means of an explosive in violation of 18 U.S.C. § 844(e) (Count Four). Count Two was subsequently dismissed on the Government's oral motion. See [489].

According to the Government, the remaining counts of the indictment are based on the following facts. On April 21, 2005, an officer of the Hinsdale Police Department arrested Defendant's son on a warrant issued from DuPage County. Defendant and his wife went to the Hinsdale police station following the arrest. Defendant behaved in an agitated and violent manner at the police station.

On September 1, 2006, an explosive device that had been placed in a trash container at the Metra train station in Hinsdale exploded (the "Hinsdale Device"). No one was seriously injured, but train service was delayed for a period of time. According to the Government: The explosive device was a pipe bomb made from a PVC pipe sealed with PVC end caps that contained Alliant Blue Dot smokeless powder. The device had a time delay that was executed with a Lux Minute Minder 60-minute timer with wire lead affixed with sealant near the 59-minute mark. The device was ignited using a model rocket igniter that was on a direct current electrical circuit that was powered by one 9-volt alkaline battery with silicone sealant on the base of the battery. The circuit was wired using 22 American Wire Gauge black insulated copper wiring. The device was mounted to a flat piece of cardboard using silicone.

A few weeks after the explosion, on October 12, 2006, the Hinsdale Police Department received a letter addressed to the Chief (the "Hinsdale Letter") threatening that "if I hear of foul play by your men someone is dead." [120-2] at 1-2. The Hinsdale Letter correctly described aspects of the construction of the Hinsdale Device that had not been made known to the public. For example, the letter correctly noted that the device had used a rocket engine and a fuse and that the device had been in a small plastic container. The letter also stated that the police had been "embarrassed and humiliated by the first experience" and emphasized that "[t]he next one will repeat that, many times over." *Id.* at 2.

2

The Hinsdale Letter was subsequently tested for fingerprints. According to the Government, seven fingerprints matched to Defendant were found on the envelope. One additional fingerprint matched to Defendant allegedly was found on the back of the adhesive label.

In addition to facing charges for the Hinsdale bombing, Defendant was also charged in the District of Utah with bombing a library in Salt Lake City, Utah on September 15, 2006—two weeks after the Hinsdale bombing. The details of that case are described in greater detail in the Court's order [465] granting in part and denying in part the Government's motion to admit evidence concerning the Salt Lake City bombing as Rule 404(b) evidence in the upcoming trial for the alleged Hinsdale bombing. In 2010, a jury in the District of Utah convicted Defendant of all charges. Defendant was sentenced to 35 years imprisonment. Defendant lost his direct appeal and his petition for habeas relief was denied. In denying Defendant's habeas petition, the Tenth Circuit concluded that it had "no issues with admission of the Rule 404(b) evidence" –*i.e.* evidence concerning the Hinsdale bombing—that was used at Defendant's trial. See *United States v. Zajac*, 680 Fed. Appx. 776, 784 (10th Cir. 2017).

Given the size of the docket (which stands at 583 entries, mostly filed by Defendant), the Court requested that the Government file a status report identifying Defendant's pending expert-related motions and the Government's responses. See [523]. At the Court's request, the parties also filed supplemental briefs concerning the status of a handful of those motions. See [571] and [568].

## II.    Analysis

### A.    "IAFIS Search by Thomas James Zajac on ATF Exhibit 25 Cardstock fingerprint by ATF Flores" [188]

This motion concerns testing performed by ATF fingerprint technician Debra Galaviz-Flores on a piece of cardstock that was recovered from the bomb debris at the Salt Lake City

library. The Government explains that the piece of cardstock was subjected to forensic examination, which revealed a latent fingerprint. According to the Government, Galaviz-Flores ran the latent print through the FBI's Integrated Automated Fingerprint Identification System ("IAFIS"), and Defendant was identified as a potential candidate for comparison with the latent print.

In motion [188], Defendant seeks an order requiring the Government to produce Galaviz-Flores' digital images of the latent prints, the "fingerprint hits resulting from IAFIS, AFIS and WIN search programs," and "the exact inked ten print card(s) used in comparison to the latent print," as well as Galaviz-Flores' case file and bench notes, protocols, documents concerning chain of custody, a list of the software Ms. Galaviz-Flores used, certain encoding records and search results, information concerning digital enhancements, documentation of corrective actions for discrepancies and errors, and the lab's accreditation for fingerprint analysis.

The Government argues that the motion is moot in part because it has previously produced digital images of the latent prints recovered from the Utah explosive device, and has also agreed to "reproduce this material to the defendant as a part of a new set of discovery to be provided to the defendant." [256] at 2. To the extent Defendant requests information beyond the latent prints themselves, the Government argues, the request is unnecessary and unduly burdensome because Galaviz-Flores will not be a witness for the government at trial and all she did in this case was a preliminary search in IAFIS to determine whether there was a potential matching fingerprint for the latent print recovered at the library. The actual fingerprint exam was conducted by another ATF forensic examiner, Jeff Lewis.

Defendant disputes the Government's characterization of Galaviz-Flores' role in this case as minor and contends that her "work product *** is central to the defense for the coming trial."

[290] at 4. According to Defendant, Galaviz-Flores, "[w]orking alone, *** downloaded the latent print from the Utah library cardstock on the very day that the defendant was arrested for that crime." [290] at 3. She then "made the decision that, among the 20 persons who were identified from her IAFIS search for fingerprint ridges on the Utah library cardstock, the defendant was the candidate who best matched the latent print." *Id*. at 4. Lewis "had no part in the processing of the ATF Exh. 25 cardstock." *Id*.

In its supplemental brief, the Government explains that it has made the items of "evidence requested by defendant physically available to defendant's expert witness Dr. Christopher Palenik for review," and also produced Galaviz-Flores's case file. [568] at 1. In his supplemental brief, Defendant argues that he has not received the discovery requested in this motion, but he does not specify what is allegedly missing or address whether Palenik was allowed access to the evidence. [571] at 1. It is therefore not clear what else Defendant wants or needs. Defendant also says that motion [188] is "part of an overall effort to authenticate 15(a) print work by Lewis." [571] at 2. But Lewis is not the subject of motion [188]. For these reasons, motion [188] is denied as moot.

**B.     "Request for Discovery" [190]**

This motion concerns certain "photographic images created" by ATF Trace Analyst Amy Michaud, including digital images. The Government argues that the motion should be denied because it has already produced to Defendant all of the photos taken by Ms. Michaud as part of her forensic analysis. See [256] at 20. The Government also asserts that to the extent that Defendant is requesting digital copies of the photos, the motion should be denied because digital images of the photos do not exist. Defendant did not reply to the Government's arguments (or the Court inadvertently missed it in the 500+ entries on this docket). The Court therefore denies [190]

as moot based on the Government's representations that it has produced the requested photos and has no additional digital images.

### C. "Motion to Limit Testimony on Trace Evidence: Suspect Material on Exhibit 82 Search Warrant Tool" [191]

In this *Daubert*-type motion, Defendant seeks an order barring ATF trace chemist Michelle Evans from testifying as an expert about green material found on Ex. 82, a hand tool described as a pair of wire cutters with black handles, being visually consistent with material from a pyrotechnic fuse. In the Utah case, Evans gave testimony at the *Daubert* hearing. According to Defendant, at the conclusion of the hearing, the district court "ruled that Evans trial testimony that the green lacquer was consistent with pyrotechnic fuse material was excluded," and the Government did not appeal the ruling. [191] at 3.

In its original response to this motion, the Government took the position that the motion was premature, as the Government had not decided which experts to call and, if Evans is called, whether to elicit the testimony that Defendant seeks to exclude. Subsequently, the Government identified Evans as an expert and disclosed her expert reports, one of which refers to a "green lacquer consistent with pyrotechnic fuse coating on diagonal cutter blades." [568] at 2. Since the Government plans to rely on the testimony challenged in motion [191], it is ordered to respond to the substance of the motion by July 10, 2020.

### D. "Motion to Stipulate to Previous *Daubert* and Trial Testimony" [203] and "Updated Motion to Docket # 203" [549]

In motion [203], Defendant seeks an order requiring the Government to provide a declaration that testimony from the Utah trial and *Daubert* hearings "will, or will not be adhered to in all coming testimony at the trial for the instant case, from those same witnesses," including Michaud, Lewis, ATF Explosives Officer Danny Waltenbaugh, ATF Explosives Officer Michael

6

Eggleston, and Salt Lake City Police Department Fingerprint Expert Bonnie Stewart. [203] at 1-2. Defendant explains that since no new discovery has been completed since the Utah trial and *Daubert* hearings, "the defense is not aware of any justification" for the witnesses to "deviate" from their prior testimony concerning their "opinions, processes, findings, interpretations, methods, protocols or conclusions." *Id*. at 2. Motion [549] renews the same request for an order made in [203]. Defendant contends that he must know in advance if the witnesses plan to "deviate" from their prior testimony so any deviation can be addressed through motion or additional *Daubert* hearings. Defendant also expands his requested relief to include an order that "only evidence established on the case record from the Utah case trial or before, will be relied upon by government experts to support their opinions and conclusions," because "there has been no post-2010 forensic analysis report produced by government experts." [549] at 4.

[203] and [549] are denied. The Court recognizes that, since he is proceeding *pro se*, Defendant would like to know about any proposed differences in the experts' testimony and evidence well in advance of trial so he has time to formulate his strategy for addressing the new material. But Defendant does not identify any source of law that would require the Government to stipulate that its expert witnesses will not deviate from the testimony they gave in a prior trial or hearing, or to rely solely on evidence used in the Utah trial. The Government will present its witnesses live at trial and Defendant will have an opportunity to cross-examine them and, as appropriate, impeach them with any inconsistent prior testimony. Further, consistent with Federal Rule of Criminal Procedure 16, the Government commits to "provide written summaries of the anticipated testimony of government expert witnesses." [256] at 26; see Fed. R. Crim. P. 16(a)(1)(G) ("The summary provided under this subparagraph must describe the witness's opinions, the bases and reasons for those opinions, and the witness's qualifications."). The

7

Government has also provided Defendant with expert reports for all of the experts it plans to call at trial. Defendant can draw his own conclusions from the summary and report about whether the Government's expert witnesses intend to testify in a manner that is inconsistent with their testimony in the Utah case and can file any motions to limit or exclude any proposed testimony.

E. **"Motion In Request for Preliminary Hearing for Sealed Docket Document #206 'Motion to Exclude…'" [212], "Motion to Exclude All Evidence Obtained and Developed Under the Initial AUSA's for the Instant Case and Under the ATF Lead Investigators for the Instant and (Potential) 404(b) Utah Case" [217], and "Motion for Relief Requested In Docket #217 Due to Government Waiver of Material Arguments Within Motion Docket #217" [470]**

These three motions concern evidence that, according to Defendant, the Government should have but failed to preserve. In motion [217], Defendant seeks an order barring the Government from introducing all evidence that was obtained or developed by the Assistant United States Attorneys ("AUSAs") assigned to this case and under the Alcohol, Tobacco and Firearms ("ATF") lead investigators for this case and the Utah case. The basis for Defendant's motion is that the Government failed to preserve two laptop bags and a mailing envelope recovered from Defendant's home during execution of a search warrant, as well as a surveillance video recorded at a Jewel grocery store. Defendant contends that the Government's failure to preserve this evidence violates his right to due process and has tainted and warrants the exclusion from trial of all evidence obtained and developed by the AUSAs in this case and the ATF lead investigators in this case and the Utah case. In motion [212], Defendant seeks a hearing on the matters raised in motion [217]. In motion [470], Defendant asserts that motion [217] should be granted on the basis of waiver because the Government failed to respond fully to the arguments asserted in his motion.

Motion [470] is denied both because the Government responded to Defendant's motion, see [256], and because Defendant offers no authority for his "waiver" claim. Motion [212] is

denied because Defendant has not shown that an evidentiary hearing is necessary or would be helpful to resolving this issue.

That leaves motion [217] and Defendant's arguments concerning the Government's alleged failure to preserve evidence. When a defendant alleges that "the government failed to preserve potentially exculpatory evidence, we apply the standard articulated in *Arizona v. Youngblood,* 488 U.S. 51 (1988)." *United States v. Fletcher*, 634 F.3d 395, 407 (7th Cir. 2011). *Youngblood* applies to evidence that could have been subjected to tests, the results of which might have exonerated the defendant. *Id*. To establish a *Youngblood* violation based on the destruction of potentially exculpatory evidence, Defendant must show (1) "that the government acted in bad faith," (2) "that the exculpatory nature of the evidence was apparent," and (3) "that the evidence could not be obtained elsewhere." *Tabb v. Christianson*, 855 F.3d 757, 768 (7th Cir. 2017); see also *McCarthy v. Pollard*, 656 F.3d 478, 486 (7th Cir. 2011). The first element, bad faith, "requires more than carelessness"; rather, "it requires a 'conscious effort to suppress exculpatory evidence.'" *Fletcher*, 634 F.3d at 408 (quoting *United States v. Chaparro–Alcantara*, 226 F.3d 616, 624 (7th Cir. 2000)). As to the second element, the "exculpatory nature of the evidence" must have been "apparent before its destruction." *Id*. at 407. "Evidence lacks apparent exculpatory value when … analysis of that evidence would have offered 'simply an avenue of investigation that might have led in any number of directions.'" *Hubanks v. Frank*, 392 F.3d 926, 931 (7th Cir. 2004).

### 1.    Briefcase recovered from Defendant's home

Two briefcases (or laptop bags) were recovered from Defendant's home during the execution of a search warrant. The briefcases were marked ATF Exhibits 65 and 76. According to Defendant, they were both photographed "at the point of recovery, while obscured by other objects." [217] at 10. The briefcases were not tested to determine if they had come in contact with

explosive material.  After they were photographed, the briefcases were returned to Defendant's sister Nancy Monahan (who is also Defendant's paralegal in this case), who donated the briefcases to charity.  According to Defendant, at the Utah trial the Government "associated briefcase exhibit 75 with a briefcase … held by the Utah case suspect in surveillance video" and contended that the briefcase, "as seen in [the] library video, contained the explosive device which detonated in the library." *Id.*

Defendant cannot establish any of the elements of a *Youngblood* violation based on these facts.  First, Defendant has not shown the bags were exculpatory.  While "it is difficult to present evidence of the contents and nature of destroyed evidence, the standard requires more than the destruction itself to support an inference that the evidence was exculpatory." *Tabb*, 855 F.3d at 768; see also *Hubanks*, 392 F.3d at 931.  According to Defendant, the laptop bags are "are germane to the Utah case only." [217] at 7.  Therefore, they cannot be exculpatory as to the charges in this case.  At most, they might weaken the Government's 404(b) case.  Further, it is unclear how the bags would have been exculpatory even in the Utah case.  Defendant contends that the size of the bags seized from his home did not match the size of the bags carried by the bombing suspect captured on video in the Salt Lake City library and that the "briefcase evidence could have exonerated him from carrying a bomb as charged." *Id.* at 20.  But assuming the bag shown in the library video did not match either briefcase recovered from Defendant's home, that would simply show that the bag that Defendant allegedly was captured on video carrying was not one of the bags later found in his home.  If the bags had been preserved and tested, it is just as likely they could have provided inculpatory evidence.  Cf. *Hubanks*, 392 F.3d at 931 (possibility that destroyed evidence could have exculpated respondent if preserved or tested is not enough to satisfy the standard of constitutional materiality for finding due process violation).

Second, Defendant has identified no evidence that the Government acted in bad faith by not preserving the briefcases and instead returning them to Ms. Monahan. Although Defendant contends (without any record support) that "[a]s of the date of the evidence elimination, Ms. Monahan had not been appointed to receive search warrant evidence from any law enforcement agency on behalf of" Defendant, [217] at 8, there is nothing about the Government's actions that suggests the bags were returned to Ms. Monahan with the intent that this would result in the loss or destruction of potentially exculpatory evidence. Instead, the Government cites to a contemporaneous law enforcement log reflecting Defendant's instruction to his lawyer to have evidence returned to his sister, which instruction was conveyed to the Government on November 20, 2006 (the date of Defendant's detention hearing in Utah). See [256] at 32 n.9, and Ex. B to [256]. The log also shows that Ms. Monahan was contacted before the items were returned to her and that she agreed to accept them. Further, the Government cites to jail telephone call records and Monahan's testimony from Defendant's habeas proceeding in Utah (where Monahan testified on his behalf), which show that Defendant knew the items were returned to Monahan and that Defendant instructed her concerning the returned items. See [256] at 33-34 and n.11.

Third, since the laptop bags were returned to Defendant's sister, and Defendant and his sister were in communication concerning evidence returned to her, the laptop bags were available to Defendant and could have been preserved at his direction if their exculpatory value was, in fact, apparent by the time they were returned to Defendant or donated to charity. Cf. *McCarthy*, 656 F.3d at 485 ("To be considered "apparently" exculpatory, the exculpatory nature of the evidence must be apparent *before* it is destroyed.").

### 2.    Mailing envelope recovered from Defendant's home

A mailing envelope was recovered from Defendant's home during execution of a search warrant and marked ATF Exhibit 42.  The front of the mailing envelope was photographed. According to Defendant, the photo does not show the envelope's flap design, fold pattern, or type of seal, but does show a label with machine text.  The envelope was submitted for forensic analysis, but subsequently recalled by ATF SA Tina Sherrow on Nov. 6, 2006  due to "no 'need the item be compared to anything.'"  [217] at 8. ATF returned the envelope to Defendant's sister, Ms. Monahan, who sent it to Defendant.  Defendant contends that the Government photographed the envelope in such way as to hide key physical characteristics and then knowingly and willfully spoliated it as a means to falsely identify Defendant as the bomber.  [217] at 19.  Defendant also contends that the envelope returned to his sister was not the same envelope shown in the photograph of ATF Exhibit 42; the letter his sister received, Plaintiff claims, did not have any label.  Defendant further asserts that "[a] request to a future jury that exhibit 42 envelope matches either of the threat letter envelopes would be baseless."  [217] at 9.

As an initial matter, the Government has provided no indication that it plans to "request to a future jury that exhibit 42 envelope matches either of the threat letter envelopes," as Defendant contends.  To the contrary, the Government represents that it "does not intend to rely upon the existence of this envelope in its case."  [256] at 36.  Even if the Government took the contrary position, Defendant would fail to satisfy *Youngblood* because he has made no showing that the envelope, if preserved, could have been exculpatory.  If it matched the envelope in which the Utah threat letter or the Hinsdale threat letter had been mailed, it arguably would have been inculpatory. But if it did not match either envelope, this would not exonerate Defendant; it would simply show that, to the extent that Defendant sent either threat letter, he did not put it is the same kind of

envelope that was recovered from his house. Further, Defendant has no evidence that the allegedly exculpatory nature of the envelope would have been apparent to the Government before the envelope was returned to Defendant's sister. Compare *United States v. Cherry*, 920 F.3d 1126, 1140-41 (7th Cir. 2019) (district court did not abuse its discretion in determining that police officer did not act in bad faith when he sold camera with which he took photographs of defendant's car and satchel after his arrest on drug charges; officer sold camera, which was his personal property, months after suppression hearing, defense counsel had not sought to inspect camera or its metadata until almost two years after that hearing, and data was not obviously exculpatory).

### 3. Jewel Surveillance Video

Defendant's last *Youngblood* argument concerns surveillance video from the shopping complex in which the Hinsdale threat letter was metered. In particular, Hinsdale police detective Charles Leuver determined that the letter was mailed from the UPS Store in Westmont, Illinois, which was located inside a Jewel grocery store. On the day the letter was received—October 12, 2006—Leuver visited the UPS Store and met with the owner, who informed Leuver that he had no surveillance video but that the Jewel store next door might have video surveillance of the parking lot area and the door from the UPS store to the Osco side of the Jewel store. The next day, Leuver met with Jewel's loss prevention manager and viewed Jewel's surveillance video. Luever was seeking to identify another suspect, Suspect A, in the video footage; at that time, Defendant had not been identified as a suspect. Suspect A was not observed in the surveillance videos. Luever's initial report states that he took possession of the video and logged it into evidence. [217] at 17; [256] at 39.

Years later, in 2009, Defendant asked the Government for a copy of the surveillance video from the Jewel store. ATF contacted the Hinsdale Police Department to obtain a copy. However,

the video could not be obtained. Instead, Leuver issued a report explaining that his earlier report was incorrect: He had intended to log the Jewel surveillance video into evidence, but upon learning that the ATF would take the lead on the investigation, he had not done so. Leuver further wrote that the video had been misplaced and had not been provided to the ATF. According to Leuver, the main/front entrance to the UPS Store was not visible on the Jewel video surveillance he reviewed. With respect to the alternate entrance to the UPS Store through the Osco section of the Jewel store, Leuver wrote that the video surveillance camera was at such a high angle that only the side view of the head of a person entering the UPS Store from the Jewel store entrance could be seen. Leuver further wrote that the quality of the video was so poor that he could not identify anyone seen on the recording in the Jewel parking lot.

Defendant's *Youngblood* argument fails because he has come forward with no evidence that anyone working for the Government acted in bad faith—rather than simply carelessly, see *Fletcher*, 634 F.3d at 408—by not obtaining and preserving the video from Jewel. ATF attempted to obtain a copy of the surveillance video in 2009, only to discover that it had not been logged into evidence by Officer Leuver or anyone at the Hinsdale Police Department. There is no evidence that ATF was responsible for Leuver's actions or ever received a copy of the video. Compare *Hart v. Mannina*, 798 F.3d 578, 589 (7th Cir. 2015) (*Youngblood* not implicated by police officers' failure to obtain from a third party and preserve allegedly exculpatory raw video footage of a reality television show where, among other things, there was no evidence footage was destroyed in bad faith; plaintiff "offered no evidence casting doubt" on defendant's explanation of why the video was not available, nor any evidence that the defendant or his employer "knew of" the request to obtain the video or "communicated with [the third party] about the footage or participated in its destruction"). Nor is there any evidence that the ATF was aware that Jewel's surveillance video

was automatically deleted after a particular period of time. Compare *Bolden v. City of Chicago*, 2019 WL 3766104, at *10 (N.D. Ill. Aug. 9, 2019) (no *Youngblood* violation "where the evidence shows only that the detectives sat idly by" and failed to obtain 911 recording before its retention period expired, but did not "direct[] the evidence to be destroyed or even know what would happen to the recording if they did not act"). Further, there is no evidence that anyone at ATF viewed the surveillance video, such that they would have any basis to know that "the exculpatory nature of the evidence was apparent." *Tabb*, 855 F.3d at 768.

**F.** **"Motion to Limit Testimony: Hinsdale Explosive Device Igniter" [221]**

In motion [221], Defendant seeks to exclude trial testimony that "refers to an electronic or pyrotechnic igniter having been recovered" from the debris from the Hinsdale explosion. *Id.* at 1. Defendant also seeks to "bar any government testimony which implies that the exploded device was detonated by any type of timed ignition system, or that the culprit could have placed the device at a time prior to detonation." *Id.* As background, Defendant explains that in his Utah trial, ATF trace chemist Evans was "the sole analyst assigned to attempt a visual, chemical or elemental identification of instant case explosive device components." *Id.* at 2. According to Defendant, Evans' January 30, 2007 expert report in that case concluded that "no type of igniter, such as an electronic igniter or pyrotechnic fuse, was recovered" from the debris from the Hinsdale explosion. *Id.* Although it is not clear from Defendant's motion, it appears that a timer and battery were found in the debris but, according to Defendant, "there is no functionality to a timer and battery without the concurrent presence of an electronic igniter," the absence of which is this case "renders the timer and battery unrelated to detonation." *Id.* Defendant contends that "[a]ny mention of the timer and battery would implicate a false contribution to detonation" and "create an unwarranted prejudice towards" Defendant, "in that the 60 minute timer would have allowed the culprit to have

been present at any time within the 60 minute time frame prior to detonation," while in fact "[s]uch a pre-blast period was not available to the placement of the device." *Id*.

In its initial response, the Government asserted that Defendant's motion is premature and stated that it would respond in greater detail after it has the chance to carefully review the blast evidence, determine the substance of the potential testimony about the Hinsdale blast by Government expert witnesses, and provide summaries of the anticipated expert testimony. However, the Court finds additional supplement briefing unnecessary and turns to the merits of the motion.

The Court grants Defendant's motion to the extent that he seeks to bar testimony that an electronic or pyrotechnic igniter was recovered from the Hinsdale blast scene, because that testimony would be inconsistent with Evans' report. Defendant's motion is denied in all other respects. As Defendant acknowledges, the Government has taken the position that other components of the alleged pipe bomb were recovered from the Hinsdale blast scene, including a timer and battery that, according to Evans, were used to detonate the bomb. While an igniter apparently was not recovered, Defendant has made no showing that this is fatal to the Government's theory of how the pipe bomb was detonated. Defendant has not eliminated the possibility that the igniter was destroyed during the explosion, or that investigators simply missed the igniter in their post-blast investigation. Presumably, the Government's case might be stronger if the igniter had been recovered. Defendant is entitled to explore this issue when cross-examining Evans, or through the introduction of testimony from his own expert.

G.     **"Motion to Suppress Certain, Specific Evidence Pertaining to Material From the Instant Case Crime Scene and Potential Utah 404(b) Case Crime Scene," [286]**

In [286], Defendant seeks an order suppressing evidence and expert testimony that "would associate an actual or visual consistency, between suspected and actual smokeless powder recovered loose from the Utah and instant crime scenes, to the brand and model of smokeless powder known as Alliant Corporation's Blue Dot model, or to known and suspected smokeless powder found loose from [when a] search warrant" was executed at Defendant's home. [286] at 5. This motion concerns two experts who testified for the Government in the Utah trial: Evans and ATF forensic chemist Barbara Simmons. The Government has identified Evans but not Simmons as an expert, while Defendant has identified Simmons as a witness he expects to call in support of the defense case.

Evans and Simmons both performed chemical analyses in an effort to identify explosive material recovered from the Utah and Hinsdale crime scenes and at Defendant's home. According to Defendant, Simmons' analysis "identifie[d] loose suspect gray disc material only, as recovered from the Utah blast scene." *Id.* at 6. By contrast, in her expert report Ms. Evans reported "additional material as specially colored pieces of blue 'identifier' smokeless powder, where these dyed pieces, mixed-in with the gray pieces makes known the brand and model of the smokeless powder." *Id.*

According to Defendant, "Evans knowingly falsified her forensic report" in the Utah case "as it pertains to a 'visual consistency' between the actual and suspected smokeless powder from the Utah and [Hinsdale] crime scenes, to the brand and model of smokeless powder known as Alliant Corporation's Blue Dot model." [286] at 5. Defendant maintains that Evans' conclusion is erroneous because there is a "dimensional disparity between actual Alliant Blue Dot product

and known explosive material from the Utah blast scene" and no "'blue identifier' disk having been demonstrated as recovered from either crime scene." *Id*. Defendant also claims that Evans "knowingly and willfully withheld results of analysis she performed which identified her suspect blue-colored smokeless powder from the Utah crime scene as a common household cement-type adhesive, not as the brand of gunpower she reported it to be." *Id*. According to Defendant, Evans' opinion "results in a false nexus which associates the defendant's search warrant property with two crime scenes, thereby lending to a prejudice that the defendant committed the crimes charged against him." *Id*. at 6.

The Government contends that motion [286] is moot in light of the Court's ruling on Rule 404(b) evidence. See [523] (Government status report). However, the Court's ruling did not address the issued raised in [286]. The Court therefore requests that the Government file a substantive response to [286] by July 10, 2020.

**H. "Motion of Renewed Request for a Court Order that Select Instant and 404(b) Case Evidence Be Availed to the Defendant's Trace Expert" [299] and "Motion: Renewed Request for Case Physical Evidence for Forensic Analysis By Defense Expert" [336]**

In motion [299], Defendant renews an earlier request for his trace expert, Dr. Christopher Palenik, to be given access to the Salt Lake City and Hinsdale threat letters in his own laboratory so he can perform his analysis in a manner that will allow him to certify the results and testify to them at trial. In motion [336], Defendant requests an order requiring the Government to turn over specific evidence (identified in Dkt. 261) to his trace expert Palenik, so that Palenik can analyze the evidence in his own laboratory. The Government and Defendant have both indicated that these motions have been resolved. See [568] at 1, 3; [571] at 6. Therefore, motions [299] and [336] are denied as moot.

I.    **"Motion to Compel the Government to Provide the Defense Fingerprint Expert With 10-Print Fingerprint Cards for Hinsdale Police Department Employees Bradley Bloom and Diane Petrovic" [302], "Motion In Request for Custody of Certain Instant Case Fingerprint Evidence" [304], and "Motion for Disclosure of Evidence Analysis" [332]**

In [302], Defendant seeks to compel the Government to provide his fingerprint expert, Lisa O'Daniel, with 10-print fingerprint cards for Hinsdale Police Department employees Bradley Bloom and Diane Petrovic. In [304], Defendant repeats the same request and expands his previous demand for fingerprint cards to include the originals of ATF Exhibits 15a and 15b, the Hinsdale threat letter and envelope. In [332], Defendant again requests 10-print fingerprint cards from Bloom and Petrovic, as well as information about whether, and to what extent, the fingerprints allegedly found on the envelope marked ATF Exhibit 15a "received computer enhancements, or corrections of any kind, while in the possession of the government." *Id*. at 1. The Government and Defendant have both indicated that these motions have been resolved. See [568] at 3; [571] at 4. Therefore, motions [302], [304], and [332] are denied as moot.

J.    **"Motion to Suppress: Salt Lake City Electric Igniter Evidence" [306]**

In [306], Defendant seeks a ruling barring any Government witness, including ATF chemist Evans, from "stating that an electronic igniter was recovered from the Utah 404b case blast scene or that an electronic igniter timed system was used to detonate the Utah exploded device." [306] at 1. As background, Defendant explains that Evans submitted an expert report in the Utah case in which she "account[ed] for the identification of two different types of igniters from [the] Utah scene blast debris: an electronic igniter (which relies on a source of electricity, like a battery) and a pyrotechnic fuse (which is activated by a red-hot surface or flame)." *Id*. at 7. Defendant does not challenge Evans' opinion concerning the pyrotechnic fuse, but argues that her "conclusion that an *electronic* igniter had been recovered is inconsistent with the evidence she

reported as recovered from the Utah blast scene, and with the observations of bystander witnesses present at the time of that blast." *Id*. Evans reported that the Utah blast scene debris included packaging for Estes Co. brand model rocket motors with electronic igniters. See [306] at 8. Evans contacted the manufacturer of the model rocket motors and obtained the dimensions and composition of their electronic igniters. Evans learned that the igniter consists of two lead wires made of nickel and iron and a bridge wire connecting the two lead wires, with one of the lead wires being 57.1 mm in length. Evans testified at the Utah trial that she found in the blast debris a small fragment of one of the two "lead wires" from an Estes Co. brand electronic igniter. Defendant challenges this conclusion because, according to him, Evans' analysis did not include measuring the fragment's length, making it impossible to demonstrate that "her proposed igniter 'tiny fragment' is configured as wire," [306] at 8-9, or that the wire matches the "diameter [or] length of known Estes igniters." *Id*. at 10. Defendant also points out that Evans' analysis of the wire revealed aluminum content, which would not be found in the lead wires of any Estes Co. model rockets.

The Government's initial response to motion [306] was that Defendant's argument is premature due to the pendency of the Court's ruling on whether the Government will be allowed to introduce Rule 404(b) evidence at trial. Since the Government filed its response, the Court has ruled on the parties' motions concerning the admission of Rule 404(b) evidence. See [465] (ruling that the Government shall be allowed to introduce evidence concerning the Salt Lake City bombing for which Defendant was convicted in the District of Utah, subject to any future rulings by the Court limiting the use of particular pieces of Rule 404(b) evidence, but shall not be allowed to introduce as evidence the fact that Defendant was convicted of the Salt Lake City bombing). A

20

substantive response to motion [306] is now required. The Government has until July 10, 2020 to respond.

K.    **"Motion In Response to Government's Request for Written Detail: Fingerprint Discovery Requested to the Defense" [317]**

Motion [317] pertains to Defendant's proposed fingerprint expert, O'Daniel, and was filed in response to the Government's May 24, 2018 request for additional details about the characteristics of fingerprint images and recordings that the Government was to provide directly to O'Daniel. Defendant conveyed O'Daniel's request that no data compression software be used for files provided on CD disk, that all images be provided in color, and that the Government observe O'Daniel's "corporate publication listing accepted standards for the conveyance of fingerprint evidence." *Id*. at 2.

The Government reports that [317] has been resolved. See [568] at 3. Defendant reports that some of the information has been provided, but not the "discovery requested in #317 sub-motions"—in particular, docket entries [187] and [197]. See [571] at 3-4. The Court previously denied [187]. See [452]; [453] at 3, ¶ 25. The Court previously granted [197], and noted that "the Government agrees to produce any discoverable expert materials it receives related to [Salt Lake City Police Department expert Bonnie] Stewart." See [452]; [453] at 4, ¶ 31. Therefore, the Court will give the Government until July 20, 2020 to produce any such discoverable expert materials or report to the Court that all such materials have already been produced.

L.    **"Motion to Compel the Government to Inquiry By the Defense as to Whether the Development of Certain Fingerprints Included Computer Enhancements or Corrective Actions" [326]**

Motion [326] relates to discovery materials for fingerprint examiner Lewis. It seeks to compel the Government to file a declaration concerning whether Mr. Lewis "at any time used a corrective or computer operated program or any other similar means in the course of developing

fingerprint evidence ATF Exhibit 15a from the instant case." The various responses filed by the Government (see [256], [318], [523]) do not directly address Defendant's request for a declaration. Nonetheless, Defendant's motion is denied. Defendant has cited no authority suggesting that the Court has authority or that it would be appropriate to order Lewis to submit a declaration. Lewis will be testifying live at trial and Defendant will have a chance to pose relevant questions to him then.

**M.** **"Motion to Quash Counts Two and Three of the Indictment and Suppress the Government's Opinion of Device Type as a Destructive Device" [331]**

In motion [331], Defendant moves to quash Counts 2 and 3 of indictment and any opinion evidence from Government expert Michael Eggleston concerning the type of destructive device employed in the Hinsdale bombing. Count 2 was dismissed after [331] was filed, so the Court will consider the motion only in relation to Count 3, possessing an unregistered destructive device in violation of 26 U.S.C. § 5861. In this *Daubert*-type motion, Defendant asserts that ATF explosives enforcement officer Eggleston falsified the expert report he provided in the Utah case "to raise the depot device from pyrotechnic device to destructive as defined by Federal Code" and "falsely report[] damage to the depot as a result of the blast." [331] at 4. According to Defendant, Count 3 of the indictment relied wholly upon Eggleston's report that the physical debris recovered from the train station showed that a destructive device was used and that the station was damaged. Defendant explains that his own pyrotechnic expert, Mark Feldmeier, reviewed the same reports and photos that Eggleston purportedly relied upon in his report, but in contrast to Eggleston "based his opinion upon the materials actually collected and analyzed from the Hinsdale deport" and opined that "the depot device is a pyrotechnic device, specifically, a small variety of pyrotechnic device known as a 'firecracker.'" *Id*. According to Defendant, the "Federal Code and Rules define [a pyrotechnic device] as a non-destructive device." *Id*. at 5. Defendant contends that as a result

22

of Eggleston's erroneous opinion, Count 3 of the indictment is "in no way substantiated through a legitimate underlying opinion of device type by the government." *Id*. Defendant concludes that the Court should quash Count 2 of the indictment, suppress Eggleston's allegedly false report, and bar Eggleston from testifying at trial.

The Government previously responded that [331] was premature because the Government has not yet determined which experts it intended to call at trial or know the testimony it would seek to elicit. More recently, the Government has reported that it is not planning to call Eggleston as a witness at trial, see [492], which moots [331] to the extent that it seeks to bar Eggleston's testimony. Motion [331] is still viable, however, to the extent that is seeks the dismissal of Count 3 based on the Government's alleged lack of a "legitimate underlying opinion of device type." The Government shall have until July 10, 2020 to file a substantive response to this portion of [331].

### N. "Motion to Dismiss Count Four of the Indictment and to Suppress Government Testimony In the Coming Trial On All Fingerprint Evidence Involving ATF Exhibit 15a" [334]

In motion [334], Defendant requests that the Court dismiss Count 4 of the indictment and suppress Government testimony (and particularly the testimony of Lewis) on any fingerprint evidence involving ATF Ex. 15a. As background, Defendant explains that Lewis processed the Hinsdale threat letter (ATF Ex. 15b) and the envelope in which it was sent (ATF Ex. 15a). Lewis "reported eight of a total of eight fingerprints he reported as developed on the threat letter envelope to be" Defendant's. *Id*. at 5. Based on Lewis' conclusion, "the government proceeded to charge the defendant with mailing the letter and therefore also with placing the device in the Hinsdale train depot." *Id*. At Defendant's subsequent trial in the Utah case, however, Lewis allegedly testified "that only three of the 8 fingerprints he found were those of the defendant." *Id*. at 6.

Case: 1:10-cr-00376 Document #: 587 Filed: 06/08/20 Page 24 of 28 PageID #:3262

Defendant contends that had "Lewis admitted back in 2006 to matching only 3 of 8 prints to the defendant the government would not have indicted on the Hinsdale case." *Id*.

The Government previously responded that motion [334] was premature because the Government had not yet determined which experts it intends to call at trial. More recently, the Government has indicated its intent to call Lewis as a fingerprint expert. See [492] at 1. The Government therefore shall have until July 10, 2020 to file a substantive response to motion [334].

O.     **"Motion for Independent Physical Inspection and/or Damage Assessment; Or In the Alternative Dismission of 18 U.S.C. § 844(i) – Count 1" [335]**

In motion [335], Defendant "moves the Court for an order compelling the government to produce the corpus delicti of the charged offense in Count 1 of the indictment" (damaging property by means of an explosive) "by permitting physical inspection and/or damage assessment of the alleged real property involved." *Id*. at 1. In the alternative, Defendant moves "for dismissal of Count 1 in the event no corpus delicti is able to be brought forth for inspection." *Id*. This motion is based on Defendant's contention that the Government has not presented any evidence that the Hinsdale train station or railroad tracks were in any way damaged or destroyed.

The Government responded that the motion is premature and stated that "[t]o the extent the defendant wishes to obtain an additional expert for damage inspection and/or assessment, the government can provide the expert with the necessary evidence as it has done with other experts in this case." [429] at 5. The Government has not responded substantively to Defendant's claim that the Hinsdale station and tracks were not damaged in any way and that, as a result, Count 1 should be dismissed. The Government is ordered to respond to this argument by July 10, 2020. Alternatively, to the extent that the Government lacks evidence of property damage, it should address whether dismissal of Count 1 would be appropriate.

24

**P.      "Motion to Dismiss Count Two of the Instant Indictment" [337]**

Motion [337] is denied as moot because Count 2 was dismissed on July 19, 2019 on the Government's motion.  See [489].  Motion [341], which asks to provide supplemental authority in support of [337], is also moot.

**Q.      "Motion to Dismiss Indictment for Rule 16 Violation and for Violation of Court Order by Government to Avail Evidence to the Defense" [380]**

In motion [380], Defendant moves to dismiss the indictment on the basis that the Government violated Federal Rule of Criminal Procedure 16 by failing to provide ATF Exhibits 1 and 2 to Defendant's expert Palenik.  In response, the Government states that the two requested exhibits were provided to Palenik on February 8, 2019.  See [429] at 19.  Based on this representation, which Defendant has not challenged, the Court denies [380] as moot.

**R.      "Request for Court Order, that Defense Experts of Record Be Allowed to View Evidence at Microtrace Co." [349]**

In [349], Defendant seeks a court order that defense experts be allowed to view evidence at Microtrace Co.  The Government states in response that this request has been resolved by joint agreement of the parties.  Based on this representation, which Defendant has not challenged, the Court denies [349] as moot.

**S.      "Motion to Bar Government Witness Substitution and Constructive Amendment of the Indictment" [401]**

In [401], Defendant seeks to bar the Government from substituting "expert witnesses whose analysis and subsequent reports contributed to the prosecution's interpretation of case evidence, such to formulate the specific construction of statutes charged, as listed in the indictment."  *Id*. at 1-2.  Those witnesses include, but are not limited to, ATF Agent Jane Balkema, ATF explosives enforcement officers Waltenbaugh and Eggleson, ATF chemists Evans, Michaud, and Simmons, and ATF fingerprint examiner Lewis.  Defendant also requests an order "barring

constructive amendment to the indictment by way of instructing the jury differently than that expressed in the specific language contained in Counts 1 and 2 of the indictment." *Id*. at 2. "Defendant seeks that a jury be instructed on Count 1 exactly as the verbiage in the charged elements of Count 1 are written with no substitution of the conjunction 'and' to a disjunctive 'or.'" *Id*.

Motion [401] is denied. The Government is entitled to call any witness who will provide relevant, admissible testimony at trial. Defendant's arguments concerning jury instructions are premature because the parties have not yet filed proposed jury instructions. If it turns out that there is a dispute concerning instructions on Count 1, the Court will address it at that time.

### T. "Motion In Request for Evidentiary Hearing Concerning Bed, Bath and Beyond Surveillance Video: New Evidence Available" [500]

In motion [500], Defendant seeks to "reopen" Dkt. 204, which sought an order requiring the Government to turn over a copy of "surveillance video provided to law enforcement from the Bed, Bath and Beyond Corporation." [204] at 1. Defendant believed that such video must exist based on notes contained in a report prepared by Officer Bass of the Burlington Northern Santa Fe "police team." *Id*. at 2. According to Defendant, Bass's September 8, 2006 report "lists that law enforcement (unnamed) will receive surveillance video from the local Bed, Bath & Beyond retail stores from their Loss Prevention Manager Jim Logan." *Id*. Dkt. 204 was denied as moot on April 29, 2019 based on the Government's representation that it has already produced copies of all records and physical evidence it obtained from Bed, Bath & Beyond. Defendant asserts that Dkt. 204 should be "reopened" based on defense investigators' recent location of and discussion with Jim Logan. According to Defendant, his investigators confirmed with Logan that: 1) all sales registers videoed patrons making purchases at all stores; and 2) the timer recovered from the Hinsdale explosive device "was sold exclusively" at Bed, Bath & Beyond stores. Defendant also

26

relies on a note from the FBI's interview of Mr. Logan that "all register sales for 6 months could be paired with the video image of the customer, even where cash sales were involved." *Id*. at 1-2.

Motion [500] is denied. The Government continues to represent that it never received any video surveillance from Bed, Bath, & Beyond. Compelling Mr. Logan to attend an evidentiary hearing cannot bring into existence that which the Government never received thirteen years ago.

**U.** **"Motion to Suppress Trial Testimony By and From the Government that Injury Occurred Due to the Detonation of the Hinsdale Depot Device" [504]**

In motion [504], Defendant seeks to suppress any testimony from a Government witness at trial that injury occurred due to the detonation of the Hinsdale explosive device. Defendant contends that "[t]estimony by or through the government at the coming trial which involves or includes injury would result in constructive amendment to the indictment, since the Government "chose to limit the indictment to statutes listing consequences from device detonation which did not include injury." [504] at 2. Defendant speculates that the Government may intend to introduce evidence of injury because it did so in his Utah case, in which evidence from the Hinsdale bombing was admitted under Federal Rule of Evidence 404(b).

The Government initially responded that Defendant's motion is premature and overbroad. According to the Government, it was premature because the Government "has not yet decided which witnesses it intends to call at trial or whether it will seek to elicit testimony about any injury caused by the bombing." [511] at 7. It was overbroad because, "should defendant open the door during direct or cross-examination of witnesses, the government should be permitted to explore that evidence." *Id*. In its recent supplemental brief, the Government stated that it "intends to introduce evidence that an injury occurred due to the detonation of the Hinsdale explosive device. Specifically, Gloria Dado, a ticket agent for BNSF, had a perforated right ear. See ATF-001-000595–000598 (Exhibit 1); ATF-006- 000001–000002 (Exhibit 2)." [568] at 4. Given its

intention to rely on evidence of physical injury, the Government shall have until July 10, 2020 to respond to the substance of motion [504].

## III.    Conclusion

For these reasons, motions [221] and [317] are granted in part and denied in part.  Motions [188], [190], [203], [212], [217], [299], [302], [304], [326], [332], [336], [337], [341], [349], [380], [401], [470], [500], and [549] are denied.  The Court defers ruling on and requests that the Government file a supplemental brief by July 10, 2020 addressing motions [191], [286], [306], [331], [334], [335], and [504], as explained in this order.  Defendant shall have until August 7, 2020 to file a reply.  This case remains set for status on July 8, 2020 at 10:00 a.m.

Dated: June 8, 2020

_____
Robert M. Dow, Jr.
United States District Judge