## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. 10-CR-376 |
| v. | ) | |
| | ) | Judge Robert M. Dow, Jr. |
| THOMAS ZAJAC | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

This matter is before the Court on the pretrial motions identified by Defendant Thomas Zajac ("Defendant") in his "Motion in Request to Adjudicate Certain Pending Defense Motions Per Federal Code DUCivr 7-3" [663] and "Second Motion in Request to Adjudicate Certain Pending Defense Motions Per Federal Code DUCivr 7-3" [670]. Motions [663] and [670] are granted and the motions identified therein are decided as follows: Motion [504], which the Court construes as a motion in limine, is granted. The Government will be precluded from introducing testimony at trial that anyone was physically injured by the blast at the Hinsdale Metra station. Motions [331], [335], [416], and [503] are denied; related motions [525], [551], [585], [591], and [594] are also denied as moot. The Government's motion in limine, [588], is denied in part as moot. A *Daubert* hearing is necessary to fully adjudicate the remaining motions identified by Defendant, [191], [286], [306], [331], [334], [469], [542], and the remainder of [588]. It is likely that the hearing will be held over a video platform given the continued COVID restrictions. At the next status hearing on February 17, 2021 at 10:30 a.m., the Court will discuss with the parties the format, anticipated amount of time needed, and other logistical issues relating to the *Daubert* hearing, as multiple experts will need to be presented for questioning from counsel and likely the Court as well. In advance of the hearing, the Court anticipates issuing a list of questions that it would like the proposed experts to be prepared to address relating to their qualifications, the

reliability of their methodologies and conclusions, and the relevance of their opinions to matters to be decided at trial.

In addition to the motions addressed above, Defendant has filed many duplicate motions, motions that have already been resolved or made moot by other orders of the Court, and documents that are not typically designated as motions. Upon review of the docket, the Court has identified the following motions that are still shown on the docket as pending but appear to be moot or otherwise not requiring Court action; these motions are denied without prejudice to Defendant filing new motions addressing the same issues if he believes a pre-trial ruling remains necessary: [184] (motion demanding production of witness statements); [192] (motion for discovery from ATF Agent Minchino and SLC police detective Layton); [261] (motion to compel Government to provide defense expert with evidence from the instant and 404(b) case); [267] (renewed motion for replacement of dysfunctional discovery media issued by case prosecutors); [287] (motion in request for court's ruling on conveyance of case evidence to defense expert Palenik); [370] (motion for instant case grand jury transcripts); [389] (motion in request: adjudication of the indictment based upon the merit of the evidence); [413] (motion for order that Government avail ATF Exh. #25 timer casing and dial to defense DNA Expert); [447] (motion in request that the Court act to enforce its Order); [456] (supplemental motion to docket #401); [476] (motion to correct contextual error within defense motion docket #469 defense's "motion to dismiss due to error in grand jury proceedings"); [512] (second motion to supplement docket #401); [516] (motion for request for discovery); [517] (motion for request for ex parte); [522] (motion for request for court order; defense interim reply to Government response docket #508 concerning Bed, Bath & Beyond retail store video evidence); [525] (request for copy of Gov.'s response to Defendant's motion Dkt. No's 500-503-504); [526] (second supplemental motion to docket #401); [527] (motion for court

order: Defense Interim reply to Government response to docket #508 concerning Bed, Bath & Beyond retail store video evidence per defense motion 500); [543] (motion for details to apparent *Daubert* hearing set by the Court); [554] (motion for ruling on docket 401); [565] (motion of objection to portions of Court order on 2/25/20 calling for a discussion of defense motions); [578] (motion in response to Government's inquiry regarding pyrotechnic expert report); [601] (motion in objection to Court's order the government provide a second response to defendant's suppression and dismissal motion); [602] (petition for copy of motion listed under Dkt. No. 588 and request for extension of time to respond to motion 588 and 587); [609] (renewed request for adjudication of defense motion dkt #542); [613] (renewed request for adjudication of dkt #542); [620] (motion for extension of time); [627] (motion for ex parte meeting); [650] (request for status hearing); [661] (motion for notice of intent to pursue trial); [673] (sealed request for ex parte meeting); [676] (request for ex parte meeting).

## I.    Background

On May 6, 2010, a grand jury returned an indictment against Defendant charging him with damaging property of the Metra Station in Hinsdale, Illinois by means of an explosive, in violation of 18 U.S.C. § 844(i) (Count One); using a destructive device during and in relation to a crime of violence, in violation of 18 U.S.C. §§ 924(c)(1)(A) and 924(c)(1)(B)(ii) (Count Two); possessing an unregistered destructive device in violation of 26 U.S.C. § 5861 (Count Three); and threatening to kill, injure, and intimidate individuals and unlawfully to damage and destroy real and personal property by means of an explosive in violation of 18 U.S.C. § 844(e) (Count Four). Count 2 was subsequently dismissed on the Government's oral motion. See [489].

According to the Government, the remaining counts of the indictment are based on the following facts. On April 21, 2005, an officer of the Hinsdale Police Department arrested

Defendant's son on a warrant issued from DuPage County. Defendant and his wife went to the Hinsdale police station following the arrest. Defendant behaved in an agitated and violent manner at the police station.

On September 1, 2006, an explosive device that had been placed in a trash container at the Metra train station in Hinsdale exploded (the "Hinsdale Device"). No one was seriously injured, but train service was delayed for a period of time. According to the Government, the explosive device was a pipe bomb made from a PVC pipe sealed with PVC end caps that contained Alliant Blue Dot smokeless powder. The device had a time delay that was executed with a Lux Minute Minder 60-minute timer with wire lead affixed with sealant near the 59-minute mark. The device was mounted to a flat piece of cardboard using silicone and ignited using a model rocket igniter that was on a direct current electrical circuit powered by one 9-volt alkaline battery with silicone sealant on the base of the battery. The circuit was wired using 22 American Wire Gauge black insulated copper wiring.

A few weeks after the explosion, on October 12, 2006, the Hinsdale Police Department received a threatening letter (the "Hinsdale Letter"), which stated in part:

> Not too long ago you fucked with the wrong person. This will likely eventually lead to the death of at least one Hinsdale citizen. It's up to you. In fairness, I fired a warning shot last month. Let's see if you're bright enough, or possess the character needed to stop this death. I don't believe you do, but my conscience will be clear. Here's the process: A couple of your goons used their positions as officers to intimidate and harass a non-threatening person in need of their help. As far as they knew, the person's life was in danger. Instead of helping they did what they could to cause as much pain as possible. Now it's my turn. I'll be watching and listening to news of the police department. I won't go out of my way, but if I hear of foul play by your men someone is dead.

[120-2] at 1-2. The Hinsdale Letter also correctly described aspects of the construction of the Hinsdale Device that had not been made known to the public. For example, the letter correctly noted that the device had used a rocket engine and a fuse and that the device had been in a small

4

plastic container. The letter also stated that the police had been "embarrassed and humiliated by the first experience" and emphasized that "[t]he next one will repeat that, many times over." *Id*. at 2. The Hinsdale Letter was subsequently tested for fingerprints. According to the Government, fingerprints (either seven or eight) matched to Defendant were found on the envelope. One additional fingerprint matched to Defendant was found on the back of the adhesive label.

In addition to facing charges for the Hinsdale bombing, Defendant was also charged in the District of Utah with setting off an explosion at a library in Salt Lake City two weeks after the Hinsdale explosion. In 2010, a jury in the District of Utah convicted Defendant of all charges. Defendant was sentenced to 35 years imprisonment.[1] During the trial, the Government introduced under Federal Rule of Evidence 404(b) evidence concerning Defendant's alleged bombing of the Hinsdale Metra Station. Defendant challenged the use of certain Rule 404(b) evidence prior to trial during *Daubert* hearings, as well as after trial in post-trial motions, a direct appeal, and post-conviction habeas proceedings. Defendant lost his direct appeal and his petition for habeas relief was denied. Ultimately, the Tenth Circuit denied Defendant's habeas petition and concluded that it had "no issues with admission of the Rule 404(b) evidence" used at Defendant's trial. See *United States v. Zajac*, 680 Fed. Appx. 776, 784 (10th Cir. 2017). In this case, the Court has ruled that the Government will be allowed to introduce evidence concerning the Salt Lake City bombing as Rule 404(b) evidence at the upcoming trial. See [464].

This opinion addresses the motions identified by Defendant in his "Motion in Request to Adjudicate Certain Pending Defense Motions Per Federal Code DUCivr 7-3" [663] and "Second Motion in Request to Adjudicate Certain Pending Defense Motions Per Federal Code DUCivr 7-3" [670].

---

[1] On November 9, 2020, Defendant's sentence on the Utah convictions was reduced to 21½ years. Defendant has appealed that sentence to the Tenth Circuit.

5

## II.     Legal Standard

The motions identified by Defendant include one motion brought by the Government pursuant to Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and a variety of motions brought by Defendant requesting various relief, including that the Court "quash" or "dismiss" counts of the Indictment and "suppress" and "limit" certain evidence and proposed expert witness testimony.

The Court has reviewed the motions and determined that, for the most part, they raise *Daubert* challenges rather than valid grounds for dismissing an indictment. "Challenging an indictment is not a means of testing the strength or weakness of the government's case, or the sufficiency of the government's evidence." *United States v. Moore*, 563 F.3d 583, 586 (7th Cir. 2009); see also *United States v. Stout*, 965 F.2d 340, 344 (7th Cir. 1992); *United States v. Firtash*, 392 F. Supp. 3d 972, 883 (N.D. Ill. 2019); *United States v. Boender*, 691 F. Supp. 2d 833, 842–43 (N.D. Ill. 2010). "Rather, it is a means to allege a defect in the indictment." *United States v. Yihao Pu*, 15 F. Supp. 3d 846, 849 (N.D. Ill. 2014) (citing Fed. R. Crim. P. 12(b)(3)(B)). "An indictment is constitutionally sufficient if it states all of the elements of the offense charged, informs the defendant of the nature of the charges so that he can prepare a defense, and enables the defendant to assess any double jeopardy problems the charge may raise." *Stout*, 965 F.2d at 344 (citing *United States v. Sloan*, 939 F.2d 499, 501 (7th Cir. 1991)); see also *Yihao Pu*, 15 F. Supp. 3d at 849. In considering a motion to dismiss an indictment, the Court "assumes all facts in the indictment are true and 'must view all facts in the light most favorable to the government.'" *United States v. Fenzl*, 731 F. Supp. 2d 796, 799 (N.D. Ill. 2010) (quoting *United States v. Yashar*, 166 F.3d 873, 880 (7th Cir. 1999)). "The court should dismiss the indictment only if the government's 'inability to produce sufficient evidence 'so convincingly appears on the face of the indictment

6

that as a matter of law there need be no necessity for such delay.'" *Id.* (quoting *United States v. Segal,* 299 F. Supp. 2d 840, 844 (N.D. Ill. 2004)).

"*Daubert* requires the district court to act as an evidentiary gatekeeper, ensuring that an expert's testimony rests on a reliable foundation and is relevant to the task at hand." *Krik v. Exxon Mobil Corp.*, 870 F.2d 669, 674 (7th Cir. 2017). In this role, "the district court must engage in a three-step analysis before admitting expert testimony." *Myers v. Illinois Central R. Co*., 629 F.3d 639, 644 (7th Cir. 2010). "It must determine whether the witness is qualified; whether the expert's methodology is scientifically reliable; and whether the testimony will 'assist the trier of fact to understand the evidence or to determine a fact in issue.'" *Id.* (quoting *Ervin v. Johnson & Johnson, Inc*., 492 F.3d 901, 904 (7th Cir. 2007)); see also *Zollicoffer v. Gold Standard Baking, Inc*., 335 F.R.D. 126, 145 (N.D. Ill. 2020) ("Together, Rule 702 and Daubert provide that an expert's testimony is admissible if: 1) the witness is qualified, 2) the expert's methodology is reliable, and 3) the testimony will assist the trier of fact to understand the evidence or to determine a fact in issue."). The party offering the expert has the burden of establishing that the proposed expert testimony meets these requirements. *Zollicoffer*, 335 F.R.D. at 145.

"The district court holds broad discretion in its gatekeeper function of determining the relevance and reliability of the expert opinion testimony." *Krik*, 870 F.2d at 674 (citing *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999)). The Seventh Circuit has "not required that the *Daubert* inquiry take any specific form"; nor has it required district courts to hold a *Daubert* hearing, if there is "a sufficient basis for [a proffered expert's] decision." *Kirstein v. Parks Corp.*, 159 F.3d 1065, 1067 (7th Cir. 1998).

The parties' motions focus primarily on the second part of the *Daubert* inquiry—whether the witness is offering a scientifically reliable and valid opinion. The Court's job in assessing

reliability is "to determine whether the expert is qualified in the relevant field and to examine the methodology the expert has used in reaching" his or her conclusions. *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000). "Although reliability must be assessed case by case, *Daubert* identified a non-exhaustive list of factors to aid the analysis." *Timm v. Goodyear Dunlop Tires North America, Ltd.*, 932 F.3d 986, 993 (7th Cir. 2019). These considerations include, but are not limited to, whether the expert's theory can and has been tested or subjected to peer review and publication; the known or potential error rate of the theory; and whether it has "achieved 'general acceptance' in the relevant expert community." *Id*. (quoting *Daubert*, 509 U.S. at 594-95). In general, the Court's inquiry "focuses not on 'the ultimate correctness of the expert's conclusions,' but rather on 'the soundness and care with which the expert arrived at her opinion.'" *Id.* (quoting *Schultz v. Akzo Nobel Paints*, *LLC*, 721 F.3d 426, 431 (7th Cir. 2013)). To satisfy Rule 702 and *Daubert*, the party offering the witness must "show that his conclusions were the fruit of a rigorous, objectively-verifiable approach—something more than mere speculation." *Id.* at 994. "[E]ven a 'supremely qualified expert cannot waltz into the courtroom and render opinions unless those opinions are based upon some recognized scientific method.'" *Smith*, 215 F.3d at 718 (quoting *Clark v. Takata Corp.*, 192 F.3d 750, 759 n.5 (7th Cir. 1999)).

III. **Analysis**

A. **Defendant's "Motion to Limit Testimony on Trace Evidence: Suspect Material on Exhibit 82 Search Warrant Tool" [191]**

In this motion, Defendant seeks an order barring ATF trace chemist Michelle Evans from offering the opinion that green material found on Exhibit 82, a hand tool described as a pair of wire cutters with black handles, is consistent (either visually or chemically) with material from a pyrotechnic fuse. At the *Daubert* hearing in the Utah case, Evans testified about Exhibit 82. According to Defendant, at the conclusion of the hearing, the district court "ruled that Evans' trial

testimony that the green lacquer was consistent with pyrotechnic fuse material was excluded," and the Government did not appeal the ruling. [191] at 3.

The Government acknowledges that the Utah District Court "precluded [Evans'] testimony regarding the green lacquer material at trial," because "the testimony at the hearing did not include the basis for Ms. Evans' opinion." [599] at 2. The Government argues that Ms. Evans' opinion should not be excluded here, however, because "the government plans to elicit the basis for Ms. Evans' opinion that the green lacquer material on the diagonal cutter blades found in defendant's storage unit was visually and chemically consistent with the green pyrotechnic fuse found at the Utah crime scene." *Id.* at 2-3. The Government does not provide a declaration from Ms. Evans, but rather cites to documents that, according to the Government, are her lab notes recording that she performed both visual and chemical analyses on the green material. See *id.* at 1-2 (citing Exs. A, C, D).

This motion cannot be resolved without a *Daubert* hearing. As the Government acknowledges, Evans did not provide sufficient testimony at the Utah *Daubert* hearing to support an opinion associating the green lacquer with fuse material. Nor has she provided a declaration or other submission in this case explaining the methodology that she used to reach her conclusion that the green lacquer was consistent with fuse material. Further, the lab notes on which the Government relies have not been properly authenticated. Instead, the Government speculates about what certain notations mean, and offers no information about the scientific processes they are meant to record. In short, there is no way to determine from the information provided whether Evans used a scientifically reliable methodology to reach her opinion concerning the green lacquer material.

In its gatekeeper role, the Court cannot allow the Government to present this information for the first time at trial—especially not where, as here, the defendant is proceeding pro se and thus will have special challenges in preparing to cross-examine the Government's witnesses. See, e.g, *General Elec. Co. v. Joiner*, 522 U.S. 136, 137 (1997) ("Nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert."); *Van v. Ford Motor Co.*, 332 F.R.D. 249, 268 (N.D. Ill. 2019) ("the Court cannot satisfy its gatekeeping function by simply accepting an expert's conclusory assertion that she reached her conclusions by using methods and relying on concepts and information generally accepted as reliable by other experts in her field"). The Court will therefore hold a hearing to give the Government an opportunity to demonstrate that Evans meets *Daubert*'s requirements, and Defendant an opportunity to cross-examine Evans and demonstrate that she does not. The Court will follow the same course for a number of other witnesses offered on both sides, as explained below.

**B.     Defendant's "Motion to Suppress Certain, Specific Evidence Pertaining to Material From the Instant Case Crime Scene and Potential Utah 404(b) Case Crime Scene" [286]**

In motion [286], Defendant seeks an order suppressing evidence and expert testimony that "would associate an actual or visual consistency, between suspected and actual smokeless powder recovered loose from the Utah and instant crime scenes, to the brand and model of smokeless powder known as Alliant Corporation's Blue Dot model, or to known and suspected smokeless powder found loose from [when a] search warrant" was executed at Defendant's home. [286] at 5. This motion concerns two experts who testified for the Government at the Utah trial: Ms. Evans and ATF forensic chemist Barbara Simmons. The Government has identified Evans but not

Simmons as an expert, but Defendant has identified Simmons as a witness he expects to call in support of the defense case.

Evans and Simmons both performed chemical analyses in an effort to identify explosive material recovered from the Utah and Hinsdale crime scenes and at Defendant's home. According to Defendant, Simmons' analysis "identifie[d] loose suspect gray disc material only, as recovered from the Utah blast scene." [286] at 6. By contrast, in her expert report Evans noted "additional material as specially colored pieces of blue 'identifier' smokeless powder, where these dyed pieces, mixed-in with the gray pieces makes known the brand and model of the smokeless powder." *Id*. According to Defendant, "Evans knowingly falsified her forensic report" in the Utah case "as it pertains to a 'visual consistency' between the actual and suspected smokeless powder from the Utah and [Hinsdale] crime scenes, to the brand and model of smokeless powder known as Alliant Corporation's Blue Dot model." *Id*. at 5. Defendant maintains that Evans' conclusion is erroneous because there is a "dimensional disparity between actual Alliant Blue Dot product and known explosive material from the Utah blast scene" and no "'blue identifier' disk having been demonstrated as recovered from either crime scene." *Id*. Defendant also claims that Evans "knowingly and willfully withheld results of analysis she performed which identified her suspect blue-colored smokeless powder from the Utah crime scene as a common household cement-type adhesive, not as the brand of gunpower she reported it to be." *Id*. According to Defendant, Evans' opinion "results in a false nexus which associates the defendant's search warrant property with two crime scenes, thereby lending to a prejudice that the defendant committed the crimes charged against him." *Id*. at 6.

The Government responds that, "[a]s an initial matter and one of common sense, differences in dimension are inherent between post-and pre-blast materials because of the

explosion." [599] at 3. Therefore, according to the Government, "[t]he fact that Ms. Evans recovered small fragments of smokeless powder as opposed to untouched disks is consistent with a post-blast scene." *Id*. (citing Ex. B at 514-517). In support, the Government cites to four pages of transcript from the Utah *Daubert* hearing. However, the cited pages do not discuss how a blast would affect the appearance of identifier disks in smokeless powder. Evans does not provide a declaration addressing this issue or discuss it in her supplemental report filed as Exhibit H to the Government's consolidated response brief. See [599-8] at 1. In addition, the Government does not address whether Evans considered the possibility, raised by Defendant, that the blue fragments were Duco cement rather than identifier disks from smokeless powder.

The Court needs additional information from Evans to assess whether she used a "rigorous, objectively-verifiable approach" in finding a consistency between material recovered from the crime scenes and Alliant Blue Dot smokeless powder. *Timm*, 932 F.3d at 994. Such an approach may not require examining the diameter of the blue identifiers, but that cannot be decided based on the limited information before the Court. These issues can be explored with Evans at the upcoming *Daubert* hearing.

### C.     Defendant's "Motion to Suppress: Salt Lake City Electric Igniter Evidence" [306]

In motion [306], Defendant seeks a ruling barring any Government witness, including Evans, from "stating that an electronic igniter was recovered from the Utah 404b case blast scene or that an electronic igniter timed system was used to detonate the Utah exploded device." [306] at 1. As background, Defendant explains that Evans submitted an expert report in the Utah case in which she "account[ed] for the identification of two different types of igniters from [the] Utah scene blast debris:" an electronic igniter (which relies on a source of electricity, like a battery) and a pyrotechnic fuse (which is activated by a red-hot surface or flame). *Id*. at 7. Defendant does not

challenge Evans' opinion concerning the pyrotechnic fuse, but argues that her "conclusion that an *electronic* igniter had been recovered is inconsistent with the evidence she reported as recovered from the Utah blast scene, and with the observations of bystander witnesses present at the time of that blast." *Id*. Specifically, Defendant challenges Evans' conclusion that a wire fragment found at the scene was consistent with an Estes lead wire because, according to Defendant, the measurements of the fragment were inconsistent with an intact Estes lead wire, and because the chemical analysis showed trace amounts of aluminum.

The Government responds with a supplemental report from Evans, which she prepared following her review of the reports of Defendant's proposed trace expert, Dr. Christopher Palenik. According to Evans, "[e]vidence from post-blast incidents will be damaged (twisted, dirty, and possibly incomplete) and exact or accurate measurements will be difficult if not impossible to obtain." [599-8] at 1. Concerning the presence of aluminum, Evans states that the wire "primarily contained Ni (most abundant) and Fe. Other elements identified were present in minor amounts and could be attributable to the post-blast scene." *Id*. The Government further argues that, even if Evans had not prepared the supplemental report, there would be no basis for excluding her opinion because "*Daubert* requires the court to determine the reliability of the methodology, not the accuracy of the conclusions." [599] at 5-6.

The Court cannot say that Defendant's criticisms of Evans' opinion concerning an electronic igniter are limited to the accuracy of Evans' conclusions, rather than the reliability of her methodology. Evans has not explained her process for determining that the wire she observed was consistent with an Estes lead wire, even though only a tiny fragment was recovered. She also has not explained how or why elements other than those contained in a wire could be detected as

a result of something that happened during the explosion.  These issues can also be explored at the *Daubert* hearing.

**D.     Defendant's "Motion to Quash Counts Two and Three of the Indictment and Suppress the Government's Opinion of Device Type as a Destructive Device" [331]**

In motion [331], Defendant moves to quash Counts 2 and 3 of the indictment and any opinion evidence from Government expert Michael Eggleston concerning the type of destructive device employed in the Hinsdale bombing.  Count 2 has been dismissed, so the Court will consider the motion only in relation to Count 3, possessing an unregistered destructive device in violation of 26 U.S.C. § 5861.  In this motion, Defendant asserts that ATF explosives enforcement officer Eggleston falsified the expert report that he provided in the Utah case "to raise the depot device from pyrotechnic device to destructive as defined by Federal Code" and "falsely report[] damage to the depot as a result of the blast."  [331] at 4.  According to Defendant, Count 3 of the indictment relied wholly upon Eggleston's report that the physical debris recovered from the train station showed that a destructive device was used and that the station was damaged.  Defendant explains that his own pyrotechnic expert, Mark Feldmeier, reviewed the same reports and photos that Mr. Eggleston purportedly relied upon in his report, but in contrast to Mr. Eggleston, Mr. Feldmeier "based his opinion upon the materials actually collected and analyzed from the Hinsdale deport" and opined that "the depot device is a pyrotechnic device, specifically, a small variety of pyrotechnic device known as a 'firecracker.'"  A pyrotechnic device, according to Defendant, the "Federal Code and Rules define as a non-destructive device."  *Id*. at 5.  Defendant contends that the product of Eggleston's erroneous opinion is that Count 3 of the indictment is "in no way substantiated through a legitimate underlying opinion of device type by the government."  *Id*.

Defendant concludes that the Court should quash Count 2 of the indictment, suppress Eggleston's allegedly false report, and bar Eggleston from testifying at trial.

The Court denies this motion. It is not a proper motion to dismiss an indictment. It challenges the sufficiency of the Government's evidence supporting an opinion of device type, rather than identifying a defect in the indictment itself. See *Moore*, 563 F.3d at 586. To the extent that Defendant seeks to exclude Eggleston's testimony at trial, that part of the motion is moot because the Government has represented that it does not plan to call Eggleston at trial. Instead, it plans to call Danny Waltenbaugh to testify about device type. Waltenbaugh's proposed testimony is subject to another motion, [542], which is addressed later in this opinion. To the extent that there is any merit to Defendant's claim that the Government's opinion concerning device type relies on materials that were not actually collected from the blast scene, the Defendant can explore this topic with Waltenbaugh at the *Daubert* hearing.

### E. Defendant's "Motion to Dismiss Count Four of the Indictment and to Suppress Government Testimony In the Coming Trial On All Fingerprint Evidence Involving ATF Exhibit 15a" [334]

In motion [334], Defendant requests that the Court dismiss Count 4 of the indictment and suppress Government testimony (and particularly the testimony of Jeff Lewis) on any fingerprint evidence involving an envelope marked ATF Ex. 15a. As background, Defendant explains that Lewis processed the Hinsdale threat letter (ATF Ex. 15b) and the envelope in which it was sent (ATF Ex. 15a). Lewis "reported eight of a total of eight fingerprints he reported as developed on the threat letter envelope to be" Defendant's. *Id*. at 5. Based on Lewis' conclusion, "the government proceeded to charge the defendant with mailing the letter and therefore also with placing the device in the Hinsdale train depot." *Id*. At Defendant's subsequent trial in the Utah case, however, Lewis testified "that only three of the 8 fingerprints he found with those of the

defendant." *Id*. at 6. Defendant contends that had "Lewis admitted back in 2006 to matching only 3 of 8 prints to the defendant the government would not have indicted on the Hinsdale case." *Id*.

In response, the Government explains that at the *Daubert* hearing in the Utah case, Lewis testified that eight of the fingerprints found on the Hinsdale threat letter belonged to Defendant. See [599] at 11. "Lewis went on to describe in detail his analysis of three of the eight fingerprints as representative of his examination of each fingerprint." *Id*. At the conclusion of the *Daubert* hearing, "the court ruled that Lewis could only testify regarding those three fingerprints." *Id*.

The Court agrees with the Government that the Utah District Court's ruling "merely limited Lewis' testimony in defendant's Utah trial." [599] at 11. However, this does not resolve the underlying question of how Lewis concluded that each of the eight fingerprints matched to Defendant. The Utah court concluded that Lewis could only testify about the three prints that he detailed in the *Daubert* hearing. Lewis has not provided any additional details in response to Defendant's motion, leaving the Court unable to say based on the current record that there is a "sufficient basis" for Lewis' opinion concerning the remaining five prints. *Kirstein*, 159 F.3d at 1067. The Court is not convinced, as Defendant urges, that this is due to any ill design by Lewis to manufacturer evidence. But that does not relieve the Government of its burden of demonstrating that Lewis' testimony concerning all of the prints complies with *Daubert*. The Government will have an opportunity to do so at a *Daubert* hearing, where Defendant will have a chance to examine Lewis about the issues raised in his motion.

> **F.  Defendant's "Motion for Independent Physical Inspection and/or Damage Assessment; Or In the Alternative Dismission of 18 U.S.C. § 844(i) – Count 1" [335]**

In motion [335], Defendant "moves the Court for an order compelling the government to produce the corpus delicti of the charged offense in Count 1 of the indictment (damaging property

by means of an explosive) by permitting physical inspection and/or damage assessment of the alleged real property involved." *Id*. at 1. In the alternative, Defendant moves "for dismissal of Count 1 in the event no corpus delicti is able to be brought forth for inspection." *Id*. This motion is based on Defendant's contention that the Government has not presented any evidence that the Hinsdale train station or railroad tracks were in any way damaged or destroyed.

The Government concedes that it does not have and does not intend to introduce evidence of actual physical damage to the Hinsdale depot. However, the Government argues, this does not warrant dismissal of Count One because it is sufficient for purposes of 18 U.S.C. § 844(i) that the Government prove that the defendant attempted to damage or attempted to destroy property. See [599] at 13-14. 18 U.S.C. § 1844(i) makes it a crime to "maliciously damage[] or destroy[], *or* attempt[] to damage or destroy, by means of fire or an explosive, any building, vehicle, or other real or personal property used in interstate or foreign commerce or in any activity affecting interstate or foreign commerce." (Emphasis added). Count One of the Indictment alleges that Defendant "did maliciously damage and destroy, *and* attempted to damage and destroy, by means of an explosive, a building and other real and personal property, namely, the Hinsdale Metra Station and accompanying railroad tracks." [4] at 1 (emphasis added). Defendant contends that "the manner in which the government chose the language to read in Count I alleges that actual damage was maliciously inflicted." [335] at 2. Since the Government has conceded no actual damage, Defendant continues, there is no factual basis for Count 1 and that Count should be dismissed.

However, the Government's "substitution of the conjunctive 'and' for the disjunctive 'or' does not torpedo [Defendant]'s indictment" based on the Government's concession that it does not intend to prove actual damage. *United States v. Cox*, 536 F.3d 723, 726 (7th Cir. 2008). The

Seventh Circuit explained in *Cox* that "where a statute defines two or more ways in which an offense may be committed, all may be alleged in the conjunctive in one count." *United States v. Cox*, 536 F.3d 723, 726 (7th Cir. 2008) (upholding a conviction under 21 U.S.C. § 841(a) where the statute uses disjunctive language, but the indictment charged in the conjunctive); see also *United States v. Kincaid*, 571 F.3d 648, 656 (7th Cir. 2009) ("We consistently … have rejected claims of error based on the use of the conjunctive in charging documents." (citing *Turner v. United States*, 396 U.S. 398, 420 (1970)). The Government's use of the conjunctive "and" does not foreclose it from seeking conviction based on proof that Defendant attempted to damage the train station. Motion [335] is denied.

### G. Defendant's "Motion to Suppress Evidence Suspect Material On Exhibit 82 Search Tool Warrant" [416]

Motion [416] is duplicative of motion [191] and therefore is denied.

### H. Defendant's "Motion to Dismiss Due to Error in the Grand Jury Proceeding" [469]

Defendant moves pursuant to the Fifth Amendment to the United States Constitution and Federal Rule of Criminal Procedure 12(b)(3)(A)(v) to dismiss Counts One and Two of the Indictment, or in the alternative the whole indictment, as a matter of law. This motion is related to motion [331], which challenges Eggleston's opinion that a destructive device was used in the Hinsdale blast. Motion [469] concerns the same opinion, which was presented to the grand jury to indict Defendant on Counts One and Two. Defendant argues: "Specifically, had the grand jury been made aware of Count One 844(i) provisions and the 924(c) provisions charged in Count Two, a substantial likelihood exists that the grand jury would not have returned Count One or Count Two or would have returned only Count One. Such awareness by the grand jury would incorporate the legal distinction, meaning and consequence of 'maliciously', 'damage', 'damage and destroy',

'destructive device', 'crime of violence', and 'attempt/attempted.'" [469] at 5. Frankly, the Court does not follow this argument, which does not identify any particular legal or factual error committed during the grand jury proceedings, and does not cite to any particular statements made during the proceedings. To the extent that Defendant believes that there was no evidence gathered from the blast scene to support an opinion that the device used was a "destructive device," Defendant can explore this issue with Waltenbaugh at the *Daubert* hearing. Motion [469] is denied.

I.    **Defendant's "Motion to Dismiss Count 3 of Indictment: Known Possession of a Destructive Device [503]**

In this motion, Defendant argues that Count Three of the Indictment (possession of a destructive device) cannot stand following dismissal of Count Two (use of a firearm in relation to a crime of violence). The Court finds the argument difficult to follow, but according to Defendant's reply "[t]he issue properly expressed … is that a missing Count Two leaves the remaining counts unassociated to each other, due to the inability of Count Three to aggravate Count One to a destructive device" (instead, the now-dismissed "Count Two clearly raised Count One to a destructive device"). [537] at 2. According to Defendant, allowing Count Three to go forward after Count Two was dismissed would result in constructive amendment to the indictment and also violate Due Process on vagueness grounds.

The Court agrees with the Government that the three counts of the complaint do not rely on the existence of one another and, therefore, the dismissal of Count Two has no effect on the remaining counts. The Court also sees nothing vague about Count Three, in the absence of Count Two. Defendant asks, "[w]hat device does Count Three refer to?" (Mot. 3.) The plain language of the Indictment makes clear that the referenced "destructive device" is a "pipe bomb." [4] at 3. Finally, Defendant does not dispute that Count Two "(1) states all the elements of the crime

charged; (2) adequately informs [him] of the nature of the charges so that he may prepare a defense; and (3) allows [him] to plead the judgment as a bar to any future prosecutions," as required to be legally sufficient. *United States v. White*, 610 F.3d 956, 958 (7th Cir. 2010). For these reasons, motion [503] is denied.

### J. Defendant's "Motion to Suppress Trial Testimony By and From the Government that Injury Occurred Due to the Detonation of the Hinsdale Depot Device" [504]

In motion [504], Defendant seeks to suppress trial testimony from any Government witness that injury occurred due to the detonation of the Hinsdale explosive device. Defendant contends that "[t]estimony by or through the government at the coming trial which involves or includes injury would result in constructive amendment to the indictment," since the Government "chose to limit the indictment to statutes listing consequences from device detonation which did not include injury." [504] at 2. Defendant speculates that the Government may intend to introduce evidence of injury because it did so in his Utah case, in which evidence from the Hinsdale bombing was admitted under Federal Rule of Evidence 404(b).

In response, the Government does not claim that anyone was physically injured in the blast. Rather, it emphasizes that what matters is intent: "In order to meet its burden to prove Count One, the government must prove that defendant maliciously attempted to use an explosive to damage or destroy property." [599] at 17. While this is correct, it is not a sufficient basis for denying Defendant's motion. The Court will construe the motion as a motion in limine. Since the Government has not proffered evidence that anyone was physically injured as a result of the blast, the Court will preclude any Government witness from testifying to the contrary. If the Government determines that evidence of physical injury does exist, it should seek reconsideration of this ruling.

20

**K.    Defendant's "Motion to Dismiss Counts 1 and 3 of the Original Indictment and to Suppress Trial Testimony on Any Specific Device Type" [542]**

Defendant seeks to dismiss Counts One and Three of the Indictment and suppress testimony from ATF explosives expert Danny Waltenbaugh that the Hinsdale depot device was any specific device type.  Defendant claims that Waltenbaugh's opinion that a destructive device was used "relies upon evidence not in fact from the scene," including an electronic igniter, [646] at 1-2, two endcaps, and physical damage to the train depot.  The Court will require the parties to explore these issues with Waltenbaugh at a *Daubert* hearing.

**L.    Government's "Motion to Exclude Expert Witness Testimony" [588]**

The Government moves to exclude the proposed testimony of defense expert Mark Feldmeier and one of the opinions of Dr. Christopher Palenik under Federal Rules of Evidence 702 and 403.

**1.    Dr. Palenik**

Defendant disclosed that he intends to call Dr. Palenik to testify that: (1) Jeffrey Lewis used computer enhancements in his Utah trial presentation; (2) cardboard submitted to a wet/dry cycle is expected to contract by a measurable amount; (3) the measurements of alligator clips found at the Hinsdale and Utah bombing sites were "not sufficiently rigorous" and "are inconsistent with the conclusion drawn by the ATF"; (4) the analyses and record keeping of the ATF is "insufficient to support the conclusions and testimony" that a metal fragment is a plated wire, lead wire, or consistent with an Estes igniter; and (5) the thickness of Alliant Blue Dot smokeless powder particles can vary.  The Government challenges only the first opinion, on the basis that Dr. Palenik is not a fingerprint expert qualified to offer the disclosed opinion.  In his response brief, Defendant states that Dr. Palenik will offer no opinions about fingerprint images.  This is consistent with the Court's understanding of Defendant's expert witness lineup.  Defendant has identified a substitute

fingerprint expert who will be performing work in the near future as the prior fingerprint expert, Ms. O'Daniel, is no longer available. Given this understanding, the portion of the Government's Daubert motion [588] seeking to exclude any fingerprint testimony by Dr. Palenik is denied as moot, as no such testimony will be proffered.

### 2.    Feldmeier

Finally, the Court turns to proposed defense expert Mark Feldmeier. Feldmeier represents that he has "worked in the pyrotechnic industry for over 28 years" and is currently licensed with the Bureau of Alcohol, Tobacco and Firearms and the State of Illinois. [588-4] at 2. He attaches to his report a copy of his driver's license, which permits him to transport pyrotechnics; an Illinois Department of Natural Resources Explosives License that permits his to store and handle pyrotechnics; and an Illinois Fire Marshal Pyrotechnic Operator license. See [588-3] at 5-6. According to the Government's motion, Feldmeier has indicated that he intends to opine that: (1) "[d]ue to no means of electronic or fuse-type ignition having been identified" within ATF forensic reports, the Hinsdale explosive was ignited by fire and not by an electric igniter, [588-3] at 5; (2) Feldmeier "has not observed damage to property or injury to pyrotechnic show patrons that was attributed to the plastic content of fireworks," *id.* at 6, and (3) the Hinsdale explosive qualifies as a pyrotechnic as that term is used in 26 U.S.C. § 5845(f), *id.*[2]

In its motion, the Government argues that Feldmeier should not be allowed to testify at trial because he is not qualified and his opinions are not sufficiently reliable. In particular, the Government explains that although the documents submitted by Defendant "show that Feldmeier may be familiar with pyrotechnics, such as fireworks, they fail to demonstrate any expertise from

---

[2] Feldmeier also stated that he attempted to ignite an Estes igniter using different types of batteries, but does not offer an opinion relating to igniters or batteries. See id. at 5. Feldmeier further notes certain purported discrepancies in the reports of Government experts but, according to Defendant's most recent brief, will not offer any opinion or testimony about discrepancies. See [634] at 3.

which Feldmeier can opine regarding the construction, functionality, or type of an exploded device." [588] at 6. According to the Government, "Feldmeier does not appear to have engaged in any scientific experiments or research of his own on the matters he seeks to opine, nor did he base his opinion on any physical inspection of the device components." *Id*. at 6-7. The Government also criticizes Feldmeier's conclusion that the explosion was caused by a pyrotechnic device because it "does not address the obvious amount of destruction caused by the explosion of the improvised explosive device, which would necessarily have an impact on the device itself, including the destruction of small wires, like an igniter wire." *Id*. at 8. Further, the Government contends that "Feldmeier ignored multiple explosive-related components of the device including the timer, battery, wires, or model rocket motor in order to reach his conclusion." *Id*.

In his response, Defendant argues that "Mr. Feldmeier's 28 years without violation of license criteria means that he is an expert in all aspects of pyrotechnic building and deployment." [634] at 4. As to the reliability of Feldmeier's opinions, Defendant focuses on whether the Hinsdale explosive qualifies as a pyrotechnic as that term is used in 26 U.S.C. § 5845(f). Apparently, Defendant believes that if a device qualifies as a "pyrotechnic," it cannot also be considered a "destructive device." Feldmeier bought the same model of PVC and end cap identified in Evans' report and, through some method that Defendant does not elaborate on in his briefs, "determine[] the maximum amount of low-yield smokeless powder these could hold." [634] at 6. In its reply, the Government disputes the relevance of Feldmeier's opinion that the Hinsdale explosive was a pyrotechnic, not a destructive device, explaining that 26 U.S.C. § 5845(f) "does not provide a broad safe-harbor for devices that resemble, share characteristics with, or are commercially manufactured as fireworks." [642] at 8.

Upon review of the briefing, the Court has concerns that at least some of Mr. Feldmeier's proffered opinions may not pass muster under Daubert and its progeny. However, it is premature to rule on the motion. Instead, the Court will convene a hearing to probe Mr. Feldmeier's qualifications, methodologies—including the connective reasoning between his methods and his conclusions, see *General Electric v. Joiner*, 522 U.S. 136, 146 (1997)—and the fit between his proposed opinions and matters of consequence in this case. In advance of the hearing, the Court will issue a detailed list of questions that Mr. Feldmeier should be prepared to address.

## IV.    Conclusion

For these reasons, motions [663] and [670] are granted and the motions identified therein are decided as follows: Motion [504], which the Court construes as a motion in limine, is granted. The Government will be precluded from introducing testimony at trial that anyone was physically injured by the blast at the Hinsdale Metra station. Motions [331], [335], [416], and [503] are denied; related motions [525], [551], [585], [591], and [594] are also denied as moot. The Government's motion in limine, [588], is denied in part as moot. A *Daubert* hearing is necessary to fully adjudicate the remaining motions identified by Defendant, [191], [286], [306], [331], [334], [469], [542], and the remainder of [588]. As noted above, it is likely that the hearing will be held over a video platform given the continued COVID restrictions. At the next status hearing on February 17, 2021 at 10:30 a.m., the Court will discuss with the parties the format, anticipated amount of time needed, and other logistical issues relating to the *Daubert* hearing, as multiple experts will need to be presented for questioning from counsel and likely the Court as well. In advance of the hearing, the Court anticipates issuing a list of questions that it would like to proposed experts to be prepared to address relating to their qualifications, the reliability of their

methodologies and conclusions, and the relevance of their opinions to matters to be decided at trial.

Finally, as a matter of docket cleanup, the following motions are denied without prejudice as moot: [184]; [192]; [261]; [267] [287]; [370]; [389]; [413]; [447]; [456]; [476]; [512]; [516]; [517]; [522]; [525]; [526]; [527]; [543]; [554]; [565]; [578]; [601]; [602]; [609]; [613]; [620]; [627]; [650]; [661]; [673]; [676].

Dated: February 4, 2021

Robert M. Dow, Jr.
United States District Judge