IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. 10-CR-376 |
| v. | ) | |
| | ) | Judge Robert M. Dow, Jr. |
| THOMAS ZAJAC | ) | |

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on various pretrial motions filed by Defendant Thomas

Zajac ("Defendant")—docket entries [334], [417], [418], [421], [424], [428], [552], [555], [614],

[714], [716], [745], [753], [763], and [811].  For the following reasons, the Court: grants motion

[421]; grants in part and denies in part motions [424] and [428]; and denies motions [334], [417],

[418], [552], [555], [614], [714], [716], [745], [753], [763], and [811].[1]

## I.    Motions to Dismiss Indictment

### A.    Grand Jury Testimony

Several of Defendant's motions to dismiss various counts of the indictment are premised

on the theory that the Government obtained the indictment against him on the basis of false

testimony presented to the grand jury and, therefore, the indictment must be dismissed.  The

Government's "knowing use of false testimony" to obtain an indictment (or a conviction) violates

due process.  *United States v. Useni*, 516 F.3d 634, 656 (7th Cir. 2008); see also *United States v.

Cosby*, 924 F.3d 329, 336 (7th Cir. 2019); *United States v. Burke*, 425 F.3d 400, 412 (7th Cir.

2005).  However, "'[m]ere inconsistencies in testimony by government witnesses do not establish

the government's knowing use of false testimony.'"  *Shasteen v. Saver*, 252 F.3d 929, 933 (7th

Cir. 2001) (quoting *United States v. Verser*, 916 F.2d 1268, 1271 (7th Cir. 1990)).  "Rather, the

---

[1] The background of this case has been set forth in multiple memorandum opinions and orders, knowledge
of which is assumed here.  See [465], [587], [682].

alleged perjured testimony must bear a direct relationship to the defendant's guilt or innocence." *United States v. Saadeh*, 61 F.3d 510, 523 (7th Cir. 1995) (internal quotation marks and citation omitted). Moreover, "[f]or an indictment to be dismissed on account of false testimony presented to the grand jury, the defendant must show prejudice amounting to either 'proof that the grand jury's decision to indict was substantially influenced, or that there is grave doubt that the decision to indict was substantially influenced, by testimony which was inappropriately before it.'" *Useni*, 516 F.3d at 656 (quoting *United States v. Feurtado*, 191 F.3d 420, 424 (4th Cir. 1999)); see also *United States v. Vincent*, 416 F.3d 593, 600 (7th Cir. 2005); *United States v. Zambrano*, 2021 WL 4318079, at *1 (N.D. Ill. Sept. 22, 2021); *United States v. Miller*, 2013 WL 3353917, at *22 (N.D. Ill. July 3, 2013); *United States v. West*, 2011 WL 839172, at *1 (N.D. Ill. Mar. 7, 2011). "In other words, '[a] district court may not dismiss an indictment for errors in grand jury proceedings unless such errors prejudiced the defendant[].'" *Vincent*, 416 F.3d at 600 (quoting *United States v. Brooks*, 125 F.3d 484, 497 (7th Cir. 1997)).[2]

### 1. Jeff Lewis' Fingerprint Testimony [334], [753], [763]

Defendant moves to dismiss Count 4 of the Indictment, for violation of 18 U.S.C. § 844(e), arguing that the indictment as to that count was procured through a false report from Government witness Jeff Lewis. Lewis, an ATF fingerprint analyst, processed fingerprints recovered from an envelope in which a threatening letter was allegedly mailed to the Hinsdale Police Department in October 2006. According to Defendant, three days after his arrest, Lewis "reported eight of a total of eight fingerprints he … developed on the threat letter envelope to be those of defendant." [334]

---

[2] Even where "errors in the grand jury proceedings would have justified the district court in dismissing the indictment prior to trial," a petit jury's "subsequent conviction" of the defendant will "render[] these errors harmless beyond a reasonable doubt." *Vincent*, 416 F.3d 593, 601 (7th Cir. 2005); see also *United States v. Philpot*, 733 F.3d 734, 741-42 (7th Cir. 2013); *Maday v. United States*, 2017 WL 2312833, at *4 (N.D. Ill. May 26, 2017); *United States v. Miller*, 2013 WL 6153005, at *6 (N.D. Ill. Nov. 22, 2013).

at 5. However, when Lewis testified at the *Daubert* hearing in the Utah case, he allegedly "contradicted his … report by testifying that only three of the 8 fingerprints he found were those of the defendant." *Id.* at 5-6. At the Utah trial, Lewis testified that three of the fingerprints matched Defendant's. *Id.* at 6. Defendant argues that these facts warrant dismissal of Count 4 of the Indictment in this case because, had "Lewis admitted back in 2006 to matching only 3 of 8 prints to [D]efendant[,] the government would not have indicted on the Hinsdale case." *Id.*; see also *id.* at 7 ("Given that all the fingerprints on envelope 15a were, according to Lewis, confirmed as those of Zajac, the defendant was charged with authoring and mailing the threat letter").

Defendant fails to convince the Court that dismissal of Count 4 is warranted due to any alleged inconsistencies between Lewis' report and his *Daubert* and trial testimony in the Utah case. As an initial matter, Defendant has made no attempt to demonstrate that Lewis even testified before the grand jury in this case, such that the Court could conclude that the grand jury relied on Lewis' allegedly false report in deciding to indict on Count 4, or that the prosecutor knowingly relied on false testimony to obtain the indictment. See *Useni*, 516 F.3d at 656 (only "knowing use of false testimony" to obtain indictment violates due process); *United States v. O'Brien*, 2018 WL 453746, at *1 (N.D. Ill. Jan. 17, 2018) (government could not be held responsible for grand jury witness' alleged perjured testimony where witness testified before government received documents that revealed the alleged perjury). Instead, Defendant focuses on the Government's decision to *seek* an indictment. He assumes, without any apparent basis, that the Government would not have sought an indictment had it known that (according to Plaintiff) Lewis could match only 3 fingerprints to Defendant. Defendant also never explains why a match of all 8 fingerprints would be necessary to obtain an indictment. After all, could not two (or more) individuals have been involved in preparing and mailing the threat letter?

3

Substantively, Defendant fails to show that Lewis was or would be unable to match all 8 prints to Defendant. Defendant does not accurately recount what happened at the Utah *Daubert* hearing or trial. The transcript that the Government attaches to its response brief shows that Lewis testified at the Utah *Daubert* hearing that he matched eight latent prints to Defendant—seven on the envelope itself and one on the adhesive side of a label attached to the envelope. See [599-10] at 31-32. Lewis went on to describe in detail his analysis of 3 of the 8 fingerprints, identified as L2, L6, and L9. See *id.* at 93-103. At the conclusion of the hearing, the court ruled that Lewis' testimony at trial would be limited to those three fingerprints, because he had not "disclosed any basis for testifying" about the other prints. [599-12] at 39. Defendant presents no evidence that Lewis ever admitted to being unable to match the other five prints, or that the Utah court ruled that he would be unable to do so, even if he had testified in greater detail about those prints. For all of these reasons, the Court denies Defendant's motions [334], [753], and [763].

### 2. Testimony Concerning Injuries Resulting from the Hinsdale Blast [552]

Count One of the indictment, for violation of 18 U.S.C. § 844(i), charges Defendant with damaging property of the Hinsdale Metra station by means of an explosive. The Indictment alleges that "defendant herein, did maliciously damage and destroy, and attempted to damage and destroy, by means of an explosive, a building and other real and personal property, namely, the Hinsdale Metra Station and accompanying railroad tracks." [1] at 1. Defendant moves to dismiss Count One on the basis that it was obtained "based on prejudicial testimony to the grand jury of injury having occurred." [552] at 1. The motion is not addressed to whether the railroad depot or other property suffered any damage. See *id.* at 2. Rather, Defendant appears to be arguing that, because personal injury was not alleged in Count One, it was improper for the Government to present testimony to the grand jury that Gloria Dado, a ticket agent for BNSF, suffered a perforated right

ear from the explosion. As evidence that this testimony was prejudicial, Defendant points out that, at the January 7, 2010 grand jury sitting, where no evidence of attempted or actual damage to the depot was presented, the grand jury did not indict; but at the May 6, 2010 grand jury sitting, where the evidence was the same except for testimony that an employee of the Hinsdale depot had been injured, the grand jury did indict. See *id.* at 3-4. The legal basis cited is that "the government may not knowingly present false testimony or fail to correct testimony known to be false." *Id.* at 5 (citing *Napue v. Illinois*, 360 U.S. 264, 269 (1959); *United States v. Hogan*, 712 F.2d 757, 762 (2d Cir. 1983)). Defendant also contends that the Government's introduction of evidence of injury at the grand jury proceeding constituted a "constructive amendment" to the indictment. *Id.* at 6.

Defendant's argument falters because he makes no attempt to demonstrate that the grand jury considered false evidence. The Government presented to the grand jury, and plans to introduce at trial, "evidence that an injury occurred due to the detonation of the Hinsdale explosive device"—specifically, evidence that "Dado, a ticket agent for BNSF, had a perforated right ear." [568] at 4. It was up to the grand jury to judge whether it believed the evidence and what weight it should be given. A grand jury's "operation generally is unrestrained by the technical procedural and evidentiary rules governing the conduct of criminal trials." *United States v. Calandra*, 414 U.S. 338, 343 (1974); see also *United States v. Gardner*, 860 F.2d 1391, 1395 (7th Cir. 1988) ("the grand jury has traditionally been accorded wide latitude in considering the evidence presented before it").

Further, Defendant has not demonstrated that evidence of injury was introduced solely to inflame or prejudice the grand jury. The fact that injury resulted from the Hinsdale explosion is relevant because it makes it more probable that the device described in Count One was an explosive device. A device that is powerful enough to cause injury to a person is also more likely to be able

to cause (or be intended to cause) damage to property. Defendant presents no evidence that the Government exaggerated Dado's injury. Rather, the Government and its grand jury witness on this point characterized the injury as "minor" and spent very little time discussing it. [704] at 31-32.

Finally, the Court is not persuaded by Defendant's "constructive amendment" argument. "'A constructive amendment of an indictment occurs when the evidence at trial goes beyond the parameters of the indictment in that it establishes offenses different from or in addition to those charged by the grand jury.'" *United States v. Shields*, 789 F.3d 733, 742 (7th Cir. 2015) (quoting *United States v. Phillips*, 745 F.3d 829, 832 (7th Cir. 2014)); see also *Ingram v. United States*, 553 F. Supp. 2d 975, 977 (N.D. Ill. 2008) (in determining whether a constructive amendment has occurred, "[t]he issue is 'whether [the defendant] was convicted of an offense not charged in the indictment'" (quoting *United States v. Pigee*, 197 F.3d 879, 887 (7th Cir. 1999))). "Such an amendment violates the Fifth Amendment and can occur during the government's presentation of evidence, through faulty jury instructions, or both." *Phillips*, 745 F.3d at 832; see also *United States v. Perez*, 673 F.3d 667, 669 (7th Cir. 2012); *United States v. Penaloza*, 648 F.3d 539, 546 (7th Cir. 2011). "The admission of evidence intricately related to the charged crimes … does not constructively amend the indictment." *United States v. Alhalabi*, 443 F.3d 605, 614 (7th Cir. 2006). There might, hypothetically, be a constructive amendment problem if the Government were allowed to argue at trial or the Court instructed the jury that Count One required the Government to prove that Defendant injured or attempted to injure a person, rather than that Defendant "damage[d] or destroy[ed], or attempt[ed] to damage or destroy … real or personal property." 18 U.S.C. § 844(i). But until there has been a trial and an error has been committed, Defendant has no basis for his constructive amendment argument.

### 3.    Testimony concerning "Site-to-Search Warrant Cardboard Evidence" [714]

Motion [714] concerns Lead ATF Special Agent Tina Sherrow's testimony to the grand jury concerning the "fit" between cardboard pieces recovered at the Hinsdale depot and the cardboard backings of two "paper writing tablets" recovered from Defendant's home during execution of a search warrant. [714] at 4. At both of the grand jury hearings that led to Defendant's indictment, Sherrow referenced and showed the grand jury a "lab image" of the cardboard pieces. At the January 7, 2010 hearing, while referencing the image, Sherrow testified as follows: "So after when the lab conducted its analysis on these pieces, this is what they find. And they found these pieces to be an exact match cut from this piece of cardboard that we found in the apartment." *Id.* at 5. At the May 6, 2010 hearing, Sherrow testified: "so, when the lab did the analysis and put all of the pieces back together, they were able to positively match this piece of cardboard that the device was placed on to the cut of this notepad that we found in his apartment." *Id.* at 6.

Defendant claims that this testimony was false or misleading because it was inconsistent with the report authored by ATF chemist Michelle Evans, who analyzed the cardboard pieces. According to Defendant, Evans' "only comments in her January 30, 2007 'Comparative' Lab Report … is that the pieces 'fit' and that she opines the cardboards from site and [search warrant] could have been 'once one.'" [714] at 4. Defendant maintains that "[t]he grand jury should have been properly limited to this information from Evans' report," *i.e.* that "the cardboards were visually consistent," because "[n]o chemical or elemental analysis matching fiber composition or structure was performed—a visual look only was reported." *Id.* at 4-5. Defendant emphasizes that "[n]owhere in case discovery does chemist Evans conclude an 'exact match' for any evidence," but rather Evans "limits her opinions to 'consistency' and 'fits' and 'were once one', but never an 'exact match.'" *Id.* at 5.

In the Court's view, Defendant is arguing over semantics. He offers no reason why Evans' process of fitting together cardboard pieces recovered from two locations could not be considered an "analysis." This is a broad term, which does not necessarily imply that anything "chemical or elemental" was done in evaluating the cardboard. To the extent that the word "analysis" might cause any confusion, the photograph that Sherrow presented to the grand jury shows what Evans did with the cardboard pieces: she fit them together, like a puzzle. Sherrow did not suggest in her testimony that more was done. She did not state that any "chemical" or "elemental" process was performed on the pieces; rather, she noted that the analysis consisted of "put[ting] all of the pieces back together." [714] at 6. Sherrow's reference to an "exact match" is not misleading either; it is consistent with Evans' conclusion that the pieces "fit[]" and "were once one." *Id*. at 5; see also, e.g., *Vincent*, 416 F.3d 593, 601 (dismissal of wire and mail fraud indictment not warranted based on government's alleged misrepresentation to grand jury that investigation included "partial audit" instead of "review of check activity," since there was no meaningful difference between those terms, and defendant otherwise did not present any evidence to suggest that two labels conferred different senses).

While Sherrow may not have parroted the exact words that Evans used in her report, there is no evidence that Sherrow provided knowingly false testimony or that prosecutors knowingly allowed Sherrow to misstate the evidence. *Useni*, 516 F.3d at 656. Further, Sherrow's use of the word "analysis" and phrase "exact match" did not prevent the members of the grand jury from making their "own decision as to the extent of a match between cardboards" or concluding, as Defendant argues, that there was not a sufficient match because the "pieces were both too long and too short in various places and ran at unexplained angles to the underlying paper perimeters" or

were "different color[s]." [714] at 7. Grand jurors could use their own eyes to make this determination.

Finally, Defendant does not discuss the other evidence on which the grand jury's decision relied or explain why it, standing alone, would be insufficient to support the decision to indict. In sum, Defendant has failed to provide either "proof" or grounds for "grave doubt" that the grand jury's decision to indict was "substantially influenced" by Sherrow's allegedly misleading testimony. *Useni*, 516 F.3d at 656. To the extent that Defendant believes that the cardboard pieces do not fit together, he is free to explore that issue with Evans or any other appropriate witness during the upcoming trial.

### 4. Evans' Alliant "Blue Dot" Smokeless Powder Testimony [745]

In motion [745], Defendant challenges Sherrow's grand jury testimony concerning Evans' identification of smokeless powder found at the Hinsdale depot blast scene and in Defendant's apartment and his storage locker, which was located below the apartment's garage. The testimony he challenges as false falls into two categories: 1) statements Sherrow allegedly made in reliance on Michelle Evans' 2006-2007 investigative reports; and 2) statements Sherrow made that allegedly deviated from what Evans stated in her reports and her testimony in the Utah case. *See* [745] at 15. Defendant asserts that these errors violated his Fifth Amendment due process rights and require dismissal of the indictment. In the alternative, Defendant asks the Court to "suppress … smokeless powder evidence, as a matter of law." *Id*. at 1.

This motion has some overlap with motion [286], which sought to suppress evidence or testimony from Evans that "would associate an actual or visual consistency[] between suspected and actual smokeless powder" recovered at the Hinsdale depot to (a) "the brand and model of smokeless powder known as Alliant Corporation's Blue Dot model"; or (b) "known or suspected

smokeless powder found loose" during the execution of a search warrant at his apartment and storage unit. *Id*. at 5. The Court scheduled a *Daubert* hearing on motion [286] and other motions in anticipation that Evans would testify. The Court's comprehensive list of potential issues that could be raised at the hearing included "Evans' methodology for finding a consistency between material recovered from the crime scenes and Alliant Blue Dot smokeless powder, and whether it was reliable." [731] at 1. Defendant repeatedly took the position that Evans should not be included in the *Daubert* hearing and withdrew motion [286]. See [758]; see also [703] ("response" filed by Defendant arguing that Evans should not appear at *Daubert* hearing because "the information the Court seeks is in fact readily available" from the transcripts of the Utah *Daubert* hearing and trial); [740] (similar).

After withdrawing motion [286], Defendant filed motion [745], which seeks to dismiss the indictment based on Sherrow's grand jury testimony but is based primarily on Evans' reports and her testimony at the Utah trial concerning her investigative findings. Evans issued two reports that are relevant to the Court's analysis of Sherrow's testimony. In her September 22, 2006 lab report, Evans concluded that particles recovered from the Hinsdale device and areas surrounding where it detonated were "smokeless powder [that] was visually consistent with Alliant Blue Dot smokeless powder." [697-2] at 3. More particularly, "[g]ray, disk-shaped double-base smokeless powder and blue, disk-shaped identifiers were recovered in" a trash can and amongst device components, water, and trash removed from the trash can. *Id*. at 2-3.

In her January 30, 2007 lab report, Evans concluded that particles recovered from various places in Defendant's apartment and storage locker were visually consistent with Alliant Blue Dot smokeless powder. See [697-3] at 7. Specifically, "[s]mokeless powder visually consistent with Alliant Blue Dot, which contains blue identifiers, was recovered" from a shop vac found in

Defendant's storage area. *Id*. "Gray disks, visually consistent with those found" in the shop vac, "were also recovered from" items found in Defendant's apartment, including vacuum filters, plastic funnels, the interior of a plastic toolbox, and green-handled needle-nose pliers. *Id*. In addition, "[f]ragments of blue identifiers were recovered from the teeth of" a pair of red-handled utility pliers found in the plastic toolbox. *Id*.; see also *id*. at 9 (chart summarizing Evans' findings as to particular pieces of evidence). Evans reported that "[a] visual and chemical comparison between the[] smokeless powder samples" recovered from different geographic locations "was not possible due to the limited quantities and conditions of the samples." *Id*. at 7.

At trial in the Utah case, Evans testified about her investigative findings. Inside the shop vac taken from Defendant's storage locker, Evans "recovered smokeless powder that was visually consistent with Alliant blue dot, which means [she] also found blue identifiers—or a blue identifier inside the vacuum cleaner." [697-7] at 76-77. She chemically tested one of the gray disks and determined it to be double base smokeless powder. See [697-6] at 143-44. In a toolbox found in Defendant's apartment, ""there was a pair of red-handled utility pliers, and [Evans] examined the pliers, the teeth of the pliers, and recovered fragments of a blue identifier." [697-7] at 86. Evans "did a chemical analysis to determine that it was smokeless powder" and "identified the nitro-pyrolytic base for smokeless powder." *Id*. at 86-87.

A number of other items recovered from the apartment (including funnels, another pair of pliers, and the toolbox) were also found to contain grey disks that were visually consistent with smokeless powder, but no blue identifiers. See [697-7] at 76-85. On cross, Evans admitted that she did not test those gray disks to determine through chemical analysis whether they were smokeless powder. See [697-6] at 147. But, as she explained on direct, it was part of her lab's "generally accepted practice" that "if all evidence received from the same location looks similar,

we don't need to analyze every single item of evidence." [697-7] at 144. She explained that "in this instance, because all the gray disks"—those recovered in the apartment and those recovered from the shop vac in the storage locker—"looked similar," she "chose the one" recovered from the shop vac "where [she] could likely say it was visually consistent with Alliant Blue Dot and that is the one [she] chose to do [her] analysis on." *Id*. at 144; see also *id*. at 80.

While motion [745] focuses primarily on Evans' reports and Utah trial testimony, it is purportedly based upon Sherrow's grand jury testimony in this case, which was given on two dates. During her January 7, 2010 testimony, Sherrow provided an overview of the pipe bomb allegedly planted by Defendant at the Hinsdale depot. Sherrow summarized that the device was a PVC pipe sealed with PVC end caps and inside the pipe was Alliant Blue Dot smokeless powder. One of the end caps was modified by having a hole drilled into the face plate and a model rocket igniter inserted into the hole to ignite the explosion. The rocket igniter was attached to 60-minute kitchen timer and a 9-volt battery. The entire device was attached to a piece of cardboard and concealed inside a trash can on the train station platform. [704] at 8. Sherrow also testified, at a high level, concerning explosive material recovered during the execution of a search warrant in Defendant's apartment and underground storage locker. See *id*. at 17. Sherrow testified that Alliant Blue Dot powder was found in the vacuum cleaner kept in Defendant's storage unit, in "sweepings" taken in his apartment using fresh, clean small vacuums, and in a pair of pliers found in the apartment. *Id*. at 17-18.

At the May 6, 2010 grand jury sitting, Sherrow testified in more detail concerning the explosives and clarified her earlier testimony. She explained that the sweepings obtained from Defendant's apartment when the search warrant was executed "contained gray disks that were visually consistent with the gray disks in the Alliant blue dot powder found in Zajac's own

vacuum," *i.e.*, the shop vac recovered from Defendant's storage locker. [704] at 29-30. Upon questioning from a grand juror about why she "change[d her] mind about the blue dot powder," Evans testified that she was just providing "a clarification." *Id*. at 33. She explained that "in the vacuum cleaner that we found ln Zajac's storage locker," there was "Alliant blue dot smokeless powder in his vacuum." *Id.* This was "the same Alliant blue dot smokeless powder that was in the device" recovered from the Hinsdale depot. *Id.* In the "sweepings [taken from the apartment], in [her] previous testimony [she] identified that it was blue dot powder when the lab identified it as in [the] sweepings they found gray disks that were visually consistent with the Alliant blue dot powder in the vacuum that [was taken] from his storage locker." *Id*. In other words, Sherrow clarified that the sweepings were not themselves determined to contain Alliant Blue Dot powder, but rather the sweepings contained gray disks that were visually consistent with the gray disks found in the shop vac, which were determined by chemical analysis and the presence of a blue identifier to be Alliant Blue Dot smokeless powder. Another grand juror then asked, "[w]ould the gray disks you're talking about [have] been consistent with other blue dot powder or is it just that particular batch, like a can's worth or whatever"? *Id*. at 33. Sherrow responded that it was the "same batch," but not necessarily the same can, as that would "depend[] on how many cans were sold of that particular batch." *Id*. at 34.

In motion [745], Defendant identifies several ways in which he believes Sherrow's testimony was false and misleading to the grand jury. Defendant asserts that Evans' January 30, 2007 report, "and as such … Sherrow's grand jury testimony, falsely informs that Alliant's product was found throughout every room within the defendant's 2nd floor living area." [745] at 11. Defendant claims that at the Utah trial, Evans reversed her position and "testif[ied] that no explosive material was found on the 2nd floor level—too late for grand jury ears." *Id*. Defendant

13

is mischaracterizing Evans' report and her trial testimony. The report does not claim that Alliant Blue Dot powder was found in every room of his apartment. Rather, it is specific that blue identifiers were found only in (1) the shop vac recovered from Defendant's storage area and (2) the teeth of the red-handled pliers found in a toolbox in Defendant's apartment. The report is also clear that the gray disks found in other areas of the apartment were determined to be "visually consistent" with the gray disks recovered from the shop vac—and not that the gray disks were themselves analyzed and determined to be Alliant Blue Dot powder. At the Utah trial, Evans testified consistent with her report. While defense counsel attempted to poke holes in her methodology—in particular, her decision to chemically analyze only the gray disk found in the storage locker, rather than the gray disks found in the apartment—Evans did not recant the facts or findings of her report. As the Government explains, "[t]he testimony excerpt cited by defendant as a 'recantation' of that testimony simply acknowledges that a conclusion that the suspect powders recovered from defendant's residence were Alliant Blue Dot powder would be a reasonable inference to be drawn from the visual comparison rather than a definitive conclusion resulting from a full chemical analysis." [756] at 3. Sherrow's May 6, 2010 grand jury testimony concerning Evans' analysis and findings also tracked Evans' report.

Defendant also argues that "[a]s listed in [Evans'] 2007 report, … Sherrow told the grand jurors that Alliant's Blue Dot model of explosive material, specifically blue particles, were found on a tool within the defendant's search warrant 2nd floor living area, implicating the construction of the depot exploded device." [745] at 12. This again mischaracterizes Evans' report. The report states that "[f]ragments of blue identifiers were recovered from the teeth of the Exhibit 56.3 red-handled pliers." [697-3]; see also *id*. at 9 (summary chart noting the same). It does not identify the fragment as Alliant Blue Dot. In her January 10, 2010 grand jury testimony, Sherrow does

14

suggest that Alliant Blue Dot powder was found in pliers in Defendant's apartment. See [704] at 18. But in her second appearance before the grand jury, she did not make this point again and clarified her testimony concerning smokeless powder to be fully consistent with Evans' report. In addition, Evans did perform chemical analysis to determine that the blue fragment found in the teeth of the red-handled pliers was smokeless powder. See [697-7], at 86-87. That may not be enough to say definitively that it was Alliant Blue Dot using the ATF's standards, but it does appear to support that inference. Regardless, Defendant has no evidence that Sherrow or prosecutors knew this single bit of testimony was arguably false or that it had a substantial influence on the grand jury's decision to indict. The blue fragment was just a small part of the explosives evidence, which in turn was just a small part of the evidence analyzed by Evans and other experts in this case. Defendant emphasizes that there were no eyewitnesses who saw him allegedly set off the Hinsdale explosion. However, he does not discuss the other evidence tying him to the crime scene, including fingerprints found on the Hinsdale threat letter and the matching cardboard pieces found with the explosive device and in Defendant's apartment.

In the next alleged error, Defendant argues that "Sherrow falsely claimed that the explosive materials found at the Hinsdale depot and his apartment and storage complex were from the same production 'batch' or 'mix.'" [745] at 12. But this is not Sherrow's testimony. Although she might have elaborated further, she accurately informed the grand jury that the gray disks found in the "sweepings" in the apartment "were visually consistent with the Alliant blue dot powder in the vacuum that we took from his storage locker," [757] at 9-10—*not* that the gray disks recovered from the Hinsdale depot were consistent with the gray disks recovered from the shop vac in Defendant's storage locker. This tracks Evans' January 30, 2007 report, which found a visual consistency between the gray disks recovered from the shop vac and various places in Defendant's

apartment, but stated that no visual or chemical comparison was done between materials recovered from different sites (*i.e.*, the Hinsdale blast scene and in the execution of the search warrant at Defendant's apartment building). See [697-3] at 9. Sherrow's answer to the grand juror's subsequent question about "the gray disks you're talking about" and whether they were "consistent with other blue dot powder or … just that particular batch, like a can's worth or whatever," *id.* at 704-705, is properly read to refer only to the gray disks that were determined to be visually consistent—*i.e.*, the ones in the shop vac and the ones from Defendant's apartment.

To the extent that a juror might not have fully understood the nuances of Sherrow's response or Evans' report, there is no evidence that Sherrow had any nefarious intent by wording her response as she did. She repeatedly stated that she was just trying to clarify what the lab did in its analysis, see [704] at 33, 35, and told the grand juror that "[i]t would really be better for the lab to explain to you the technical details of how they identify the disks and how they match it." *Id.* at 34. This undermines Defendant's speculation that Sherrow—or prosecutors—were doing anything to intentionally mislead the grand jury to obtain an indictment. Cf. *United States v. DiCosola*, 2015 WL 2330233, at *5 (N.D. Ill. May 14, 2015) (defendant failed to show government knowingly relied on perjured testimony at trial, where challenged testimony "was based on a reasonable reading of a document submitted into evidence, and the Government does not appear to have knowingly suborned perjury").

Finally, Defendant challenges Evans' (and in turn Sherrow's) identification of the explosive materials at the Hinsdale depot as Alliant Blue Dot smokeless powder on the basis that "one green identifier was reported from the depot debris"—rather than a blue identifier. See [745] at 5. At the Utah trial, Evans explained that when she initially examined the identifier disk on September 3, 2006, she wrote in her notes that it was "green." [756-2] at 2. The next day, she

changed her notes, after "compar[ing] it to other smokeless powders that [ATF had] in [its] exemplar room." *Id*. at 3. Evans also spoke about the issue with Cindy Wallace, a senior chemist in the lab, whom Evans considered "probably the foremost expert in our laboratory on smokeless powder." *Id*. After this further analysis, Evans wrote in her notes, "most likely Blue Dot." *Id*. Evans further explained that "Alliant is known to vary their dyes throughout the years and … things will change and look different. It could be greenish blue, it could be a bluish green." *Id*. at 4. Sherrow's testimony to the grand jury was consistent with Evans' conclusion that the identifier disk was blue. As he had in the Utah trial, Defendant will have the opportunity to cross-examine Evans at trial on her initial assessment that the disk was green rather than blue. For these reasons, the Court denies motion [745].[3]

## B.   Alleged Destruction of Fingerprint Evidence [555]

In Count 4 of the Indictment, for violation of 18 U.S.C. § 844(e), Defendant is charged with using the mail to make a threat to kill, injure, and intimidate individuals and to damage and destroy real and personal property by means of an explosive device. In motion [555], Defendant

---

[3] After withdrawing motion [285] and filing motion [745], Defendant also filed [783], which he titles "Objection … to and request for and request for reconsideration to court's ultimatum for a defense Daubert challenge to ATF Chemist Evans over defense motion Dkt, #286." (This is not a motion and does not have a gavel beside it.) Defendant requests that the Court "rescind its strategy of holding private hearings with the government's trace expert ATF Evans," "reinstate defense Motion #286 and proceed with hearings which include the defendant and prosecutors," and "[i]f the Court cannot obtain a satisfactory response from chemist Evans, then [d]efendant will agree to *Daubert* hearings." [783] at 4. To the extent that Defendant intends this objection to be a motion, it is denied. Defendant voluntarily withdrew motion [283] and it has been stricken. The Court never suggested holding "private hearings" with Evans; rather, it included her in plans for the *Daubert* hearings because motion [286] raised a *Daubert* challenge, see *id*. at 2-3, as it is the Court's job to act as the gatekeeper for expert testimony, and the Court believed that the technical issues raised by Defendant's motion might be best addressed to Evans in person, rather than through a piecemeal review of her investigative reports and transcripts from a different case. In open court and multiple filings, Defendant objected to this plan. Further, the Court is not convinced that having further *Daubert* proceedings with Evans would be fruitful. Defendant makes the same basic arguments in [745] as he does in [286]. For the reasons explained above, Defendant fails to demonstrate that any purported errors in Evans' reports or Sherrow's grand jury testimony concerning those reports justifies dismissing the indictment. To the extent that Defendant has criticisms about Evans' methodology or conclusions, he is free to explore them during cross-examination at trial, just as his attorney did at the Utah trial.

seeks dismissal of this count on the basis that the Government allegedly destroyed potentially exculpatory fingerprint evidence. See also [387] (Defendant's earlier motion raising same argument). In particular, the motion concerns the label on the envelope that contained the threat letter sent to the Hinsdale police department (ATF Exhibit #15). One fingerprint was found on the back of the label. ATF has referred to this as latent print 9, or "L9." There is no dispute that there are tiny holes and blue ink dots on the label. The Government explains that after the fingerprint was photographed, the Government submitted the envelope (and other pieces of evidence) to the United States Secret Service ("USSS") requesting a comparison of printed materials with printing devices recovered from the search of Defendant's apartment. The USSS conducted physical, optical, and chemical examinations on the exhibits, which resulted in the tiny holes and ink marks on the label contained on ATF Exhibit #15.

Defendant argues that USSS's activities "destroyed" the fingerprint. [555] at 2. According to Defendant, the holes and ink have "ruined" the "critical area" of fingerprint ridge detail "used by fingerprint experts for comparison to 'known' prints." [387] at 4. Defendant maintains that "[t]he damage to L9 fingerprint image eliminates the ability for the defendant to vindicate himself from having handled the mailing label underside, as charged by the government in Count 4." *Id.*. at 5. Defendant asserts that the Government did this intentionally to "preclude contradiction to [its] theory of ownership to be that of the defendant." *Id.* at 7.

In *Arizona v. Youngblood*, 488 U.S. 51, 56-58 (1988), the Supreme Court held that a due process violation may result when the State destroys evidence in bad faith. "*Youngblood* applies when … the government failed to preserve evidence that '*could* have been subjected to tests, the results of which *might* have exonerated the defendant.'" *United States v. Fletcher*, 634 F.3d 395, 407 (7th Cir. 2011) (quoting *Youngblood*, 488 U.S. at 57; emphasis in *Fletcher*).

18

Dismissal of Count 4 based on *Youngblood* is not warranted because Defendant fails to demonstrate that the USSS's processing of the fingerprint rendered it unusable for defense purposes. Defendant's first fingerprint expert, Lisa O'Daniel, conducted a comparison of the L9 fingerprint to fingerprint cards provided by Hinsdale Police Department employee Bradley Bloom. O'Daniel was able to conclude that "L9 was not made by the person who made the fingerprint card marked Bradley J. Bloom." [697-12] at 3. O'Daniel did not note any difficulties in making her comparison. The Court recognizes that when O'Daniel compared the fingerprint cards provided by Hinsdale Police Department employee Diane Petrovic, her results were inconclusive. But this was not due to any problem with L9; instead, the issue was that "[t]he fingerprint card marked Diane Petrovic contained almost no detail," which "may be a natural condition" of Petrovic's hands. *Id.* at 3 n.1. Defendant argues that O'Daniel did her comparisons using a photograph of L9 that was taken before the print was sent to USSS for further testing and, therefore, the Government cannot show that O'Daniel used the original, now damaged print for her analysis. Regardless, the Government's point stands: the L9 print was preserved in a manner that made it possible for Defendant's experts to perform their own analysis. Defendant does not identify any additional analysis that his experts would have done had the original L9 not been subjected to USSS's testing. Therefore, motion [555] is denied.

### C. Interstate Commerce [811]

In motion [811], Defendant argues that Count One of the Indictment, for violation of 18 U.S.C. § 844(i), must be dismissed due to lack of jurisdiction because the Government "has not demonstrated that the Hinsdale depot structure, the accompanying railroad tracks, or other property was actively involved in interstate commerce." [811] at 2 (relying on *Jones v. United States*, 529 U.S. 848 (2000)). Defendant further argues, based on *United States v. Lopez*, 514 U.S. 549 (1995),

that "the government has not proved that substantive adverse effect occurred to interstate commerce due to the device detonation." [811] at 2.

Motion [811] is denied because it fails to identify a valid basis for dismissing the indictment. "An indictment is legally sufficient if it (1) states all the elements of the crime charged; (2) adequately informs the defendant of the nature of the charges so that he may prepare a defense; and (3) allows the defendant to plead the judgment as a bar to any future prosecutions." *United States v. White*, 610 F.3d 956, 958 (7th Cir. 2010) (citing Fed. R. Crim. P. 7(c)(1)). "An indictment is reviewed on its face, regardless of the strength or weakness of the government's case." *Id*. An indictment that "'tracks' words of a statute to state the elements of the crime is generally acceptable, and while there must be enough factual particulars so the defendant is aware of the specific conduct at issue, the presence or absence of any particular fact is not dispositive." *Id*. at 958-59. An indictment "need not exhaustively recount the facts surrounding a crime's commission." *United States v. Firtash*, 392 F. Supp. 3d 872, 882 (N.D. Ill. 2019).

Applying these standards, the indictment here is legally sufficient. 18 U.S.C. § 844(i) makes it a criminal offense to "maliciously damage[] or destroy[], or attempt[] to damage or destroy, by means of fire or an explosive, any building, vehicle, or other real or personal property used in interstate or foreign commerce or in any activity affecting interstate or foreign commerce." "Interstate commerce," as used in Title 18, "includes commerce between one State, Territory, Possession, or the District of Columbia and another State, Territory, Possession, or the District of Columbia." 18 U.S.C. § 10. The indictment alleges, in regard to the "interstate commerce" element challenged in Defendant's motion, that the "Hinsdale Metra Station and accompanying railroad tracks [were at the time of the explosion] used in interstate commerce and in an activity affecting interstate commerce." [4] at 1. This allegation states the "interstate commerce" element

20

of § 844(i), gives Defendant enough information so that he may prepare a defense, and is specific enough to allow him to plead the judgment as a bar to any future prosecutions. See *White*, 610 F.3d at 958. No more is required at this stage of the case. See, e.g., *United States v. Hollinger*, 553 F.2d 535, 548-49 (7th Cir. 1977) (indictment charging various counts of income tax violations and obstruction of commerce by extortion was not subject to dismissal for insufficiency due to absence of an adequate factual basis to charge interference with interstate commerce).

Even if the indictment were subject to a more searching inquiry, Defendant fails to convince the Court that the Government will be unable to prove at trial that the alleged explosion involved "real or personal property used in interstate or foreign commerce or in any activity affecting interstate or foreign commerce." 18 U.S.C. 844(i). The two Supreme Court cases on which Defendant relies are easily distinguishable. In the first, *Jones*, the Supreme Court held that "an owner-occupied residence not used for any commercial purpose does not qualify as property 'used in' commerce or commerce-affecting activity; arson of such a dwelling, therefore, is not subject to federal prosecution under § 844(i)." 529 U.S. at 850-51. The *Jones* Court contrasted that case with *Russell v. United States*, 471 U.S. 858 (1985), in which it held that § 844(i) "applies to a two-unit apartment building that is used as rental property." *Id*. at 858. In *Russell*, the Court reviewed § 844(i)'s legislative history, which it summarized to "suggest[] that Congress at least intended to protect all business property, as well as some additional property that might not fit that description" (such as police stations and churches), "but perhaps not every private home." *Id*. at 862. The Court opined that the "rental of real estate" was "unquestionably such an activity," as "the local rental of an apartment unit is merely an element of a much broader commercial market in rental properties." *Id*. at 862. The Court concluded that "[t]he congressional power to regulate the class of activities that constitute the rental market for real estate includes the power to regulate

individual activity within that class." *Id.*; see also *United States v. Adame*, 827 F.3d 637, 644 (7th Cir. 2016) ("If the government presents evidence that the building at issue is used as rental property, then the government satisfies its evidentiary burden for the interstate commerce element under § 844(i).").

This case is much more like *Russell* than *Jones*. There can be no serious debate that the Hinsdale train depot is a "business property" used for commercial purposes. *Russell*, 471 U.S. at 860. Defendant does not claim, for instance, that the depot is a residential property, or that the depot had been abandoned prior to the explosion. Rather, the depot is and was actively used for commercial purposes—transporting people and goods within the state of Illinois and to and from other states. *Russell*, 471 U.S. at 860; see also, e.g., [757] at 6 (grand jury testimony of ATF Special Agent Sherrow agreeing that "according to BNSF's web site they operate interstate trains that run throughout much of the middle and western part of the United States" and that at the Hinsdale depot, "Metra tickets are sold on the platform and there's also a small restaurant, food stand").

Defendant also relies on *Lopez*, 514 U.S. 549, for the proposition that the Government is required to prove that a "substantive adverse effect occurred to interstate commerce due to the device detonation." [811] at 2. Defendant claims that the Government will be unable to meet this burden at trial because it "does not intend to introduce evidence that … the train service was delayed due to the … explosion." *Id.* at 4. "In *Lopez*, the Court determined that in enacting 18 U.S.C. § 922(q), the Gun–Free School Zones Act, Congress had exceeded the 'outer limits' of its power under the Commerce Clause." *United States v. Bell*, 70 F.3d 495, 498 (7th Cir. 1997). "Under the clause, Congress can regulate, the court recounted, three broad categories of activity: the use of the channels of interstate commerce; the instrumentalities of interstate commerce and

persons and things in interstate commerce; and activities having a substantial relation to interstate commerce." *Id.* (citing *Lopez*, 514 U.S. at 558-59). The third category was "the only possible justification for § 922(q)." *Id.* The statute "failed to survive the constitutional challenge because it was not an essential part of a larger regulation of economic activity and it did not contain a 'jurisdictional element which would ensure, through case-by-case inquiry, that the firearm possession in question affects interstate commerce.'" *Id.* Unlike *Lopez*, this case likely involves "use of the channels of interstate commerce" and "instrumentalities of interstate commerce"— interstate trains and associated property. And unlike the statute at issue in *Lopez*, § 844(i) "contains an explicit requirement that a nexus to interstate commerce be established." *Bell*, 70 F.3d at 498. This ensures that, when the case goes to trial, the Government will be required to prove that Defendant's alleged destruction or attempted destruction by means of an explosive affected interstate commerce or an activity affecting interstate commerce.

## II.    Motions in Limine

Defense motions [417], [418], [421], [424], and [428] are all titled "motions to suppress" but are, in substance, motions in limine seeking to prevent the Government from using certain evidence at trial on the basis that it is not relevant and/or any relevance would be outweighed by the risk of prejudice to Defendant.[4] "[A] 'motion to suppress' is any objection outside the Rules of Evidence because '[n]othing in the Rules of Evidence allows a court to reject relevant, inculpatory evidence seized from the defendant's home, heard during a wiretap, based on his confession, or derived from a lineup.'" *United States v. Cardena*, 842 F.3d 959, 987–88 (7th Cir. 2016) (quoting *United States v. Acox*, 595 F.3d 729, 733 (7th Cir. 2010)). Given society's "strong

---

[4] To the extent that these motions challenge the use of evidence related to the Utah case only, they are moot due to the parties' agreement not to use Rule 404(b) Utah evidence. This opinion does not discuss Utah-only evidence.

interest in admitting all relevant evidence," "a defendant is entitled to suppression only in cases of constitutional violations." *United States v. Ozuna*, 561 F.3d 728, 734 (7th Cir. 2009) (citing *United States v. Regilio,* 669 F.2d 1169, 1177 (7th Cir. 1981)).

In contrast to a motion to suppress, "a motion in limine is the proper procedure" where "evidence fails the relevance standard of Federal Rule of Evidence 401, or its probative value is greatly outweighed by its prejudicial impact, as described in Federal Rule of Evidence 403." *United States v. Nelson*, 958 F.3d 667, 670 (7th Cir. 2020) (internal quotation marks and citation omitted). "Evidence should be excluded in limine only where it is clearly inadmissible on all potential grounds." *United States v. Lillie*, 669 F. Supp. 2d 903, 905 (N.D. Ill. 2009). It is the movant's burden to make the required showing. *Id*. "'Unless evidence meets this high standard, evidentiary rulings should be deferred until trial so that questions of foundation, relevancy and potential prejudice may be resolved in proper context.'" *Id.* (quoting *Hawthorne Partners v. AT&T Techs., Inc*., 831 F. Supp. 1398, 1400 (N.D. Ill. 1993)). "Because motions in limine are filed before a court has seen or heard the evidence at trial, rulings in limine are preliminary decisions that may be subject to alteration or reconsideration based upon the court's exposure to the evidence at trial." *United States v. Jin*, 833 F. Supp. 2d 957, 961 (N.D. Ill. 2011) (citing *United States v. Connelly*, 874 F.2d 412, 416 (7th Cir. 1989)). As a result, "[d]enial of a motion in limine does not mean that all evidence contemplated by the motion will be admitted at trial." *Lillie*, 669 F. Supp. 2d at 905.

### A.  PVC and Drill Bits [417]

In motion [417], Defendant seeks to exclude evidence and testimony concerning certain items recovered from the search of his apartment and storage locker, including (1) four Nibco PVC pipe end caps (ATF Exhibit #97); (2) a black plastic box that contained drill bits (ATF Exhibit

#93); and (3) a yellow plastic drill bit holder that contained drill bits (ATF Exhibit #95).  None of these items are a "match" for items recovered from the scene of the Hinsdale blast.  In particular, the manufacturer of the recovered pipe end caps (Nibco) is different from the manufacturer of the PVC pipe components used in the Hinsdale destructive device (Mueller). There was a 1/8" hole drilled in the faceplate of a PVC square head plug recovered from the Hinsdale blast, but Evans concluded that the PVC flakes recovered from ATF Exhibits 93 and 95 were visually inconsistent with the Hinsdale device's PVC.  Defendant asserts that these exhibits are not relevant because they do not match the materials used to construct the Hinsdale device.  Therefore, Defendant contends, they could have "only a prejudicial affect against the defendant" and confuse the jury. [417] at 5.

The Court agrees with the Government that even though the endcaps and the PVC flakes do not match the materials recovered from the Hinsdale depot, they are nonetheless relevant under Federal Rule of Evidence 401.  The presence of PVC pipe components in defendant's residence is relevant to assessing Defendant's familiarity with and access to PVC pipe and pipe components as well as Defendant's capability to manufacture the Hinsdale explosive device.  Evidence that PVC flakes were observed on two 1/8" drill bits is relevant to establishing defendant's familiarity with and ability to drill out such holes from PVC materials, his familiarity with the tools and materials that were used to construct the Hinsdale device, and his ability to employ certain techniques that were used in that device's construction.

The Court is not convinced, at least based on the current record, that the probative value of this evidence is substantially outweighed by the risk of unfair prejudice or confusing the jury.  See Fed. R. Evid. 403.  The fact that the components from Defendant's apartment are dissimilar in some ways from those at the blast site is likely to come out during direct examination and, if it

25

does not, can be brought out by Defendant on cross-examination. Defendant will also be free to advance his own position that the exhibits at issue are "common plumbing materials," with no relevance to the charged crimes. [712] at 2. See, e.g., *United States v. Parr*, 545 F.3d 491, 502 (7th Cir. 2008) (probative value of testimony of defendant's former girlfriends and neighbors about defendant's pervasive interest in explosives, history of building pipe bombs and experimenting with chemicals, and admiration for domestic terrorist was not outweighed by risk of unfair prejudice in prosecution for threatening to use weapon of mass destruction against federal building); *United States v. Adkins*, 743 F.3d 176, 184 (7th Cir. 2014) (evidence of defendant's failed trip to Canada to procure heroin was more probative than prejudicial, and thus was properly admitted in trial for attempting to possess heroin with intent to distribute, based on his receipt of shipment of heroin at his home a week later, as evidence went to defendant's knowledge, preparation, and intent).

### B.     Alligator Clips [418]

Motion [418] concerns three alligator clips recovered from the Hinsdale blast scene (none with rubber covers) and one alligator clip recovered during execution of a search warrant at Defendant's apartment. The Hinsdale destructive device included three alligator clips without covers. See [697-2] at 2-3. Alligator clips with rubber covers were recovered from a black plastic case found in Defendant's apartment. *Id*. at 2. Evans compared the alligator clips found in the two locations and concluded that they were visually consistent. *Id*. at 3. Evans explained at the Utah *Daubert* hearing that this assessment was based on visually discernible characteristics of the various alligator clips (*i.e.*, size, color, shape) and that she did not engage in chemical analysis to determine whether the alligator clips were composed of identical materials. [697-4] at 68. Evans's

conclusion of visual consistency was based on the alligator clips themselves and not on the removable, rubber covers found on some of the alligator clips. See *id.*; see also [697-5] at 2.

Defendant moves to exclude the alligator clips and testimony concerning the alligator clips on the basis that Evans did not adequately support her conclusion that the clips were visually consistent. Setting aside Defendant's criticism of her comparison of an alligator clip recovered from the Utah blast site, which is no longer relevant, Defendant's argument relies on a report by his expert, Dr. Christopher Palenik, who criticizes Evans' lab notes for being insufficiently precise. See [418] at 47 *et seq.* Palenik opined that "the alligator clip measurements were not collected under sufficiently rigorous procedures to demonstrate that the clips are consistent with each other" and, therefore, Evans' "conclusions and testimony that the alligator clips are consistent based upon visual inspection and measurements is overstated." *Id.* at 50. In particular, Evans did not assign "unique identifiers" to the alligator clips; she stated that "all are ~1-1/8" long" rather than recording exact, individual measurements; she did not provide an "associated uncertainty" measurement; and she failed to use metric measurements as are "commonly used by the scientific community." [418] at 49-50.

Motion [418] is more a *Daubert*-type challenge than Defendant's other "motions to suppress." Briefly stated, Rule 702 and *Daubert* require the Court to "'determine only that the expert is providing testimony that is based on a correct application of a reliable methodology and that the expert considered sufficient data to employ the methodology.'" *Gopalratnam v. Hewlett-Packard Co.*, 877 F.3d 771, 780 (7th Cir. 2017) (quoting *Stollings v. Ryobi Techs., Inc.*, 725 F.3d 753, 766 (7th Cir. 2013)). "Reliability ... is primarily a question of the validity of the methodology employed by an expert, not the quality of the data used in applying the methodology or the conclusions produced." *Manpower, Inc. v. Ins. Co. of Pa.*, 732 F.3d 796, 806 (7th Cir. 2013).

"The soundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions based on that analysis are factual matters to be determined by the trier of fact." *Gopalratnam*, 877 F.3d at 781 (internal quotation marks and citation omitted).

Defendant's criticism of Evans' opinion regarding alligator clips does not warrant exclusion under *Daubert* or Rules 401 and 403. Defendant and Palenik do not challenge that visual comparison is a valid methodology for comparing alligator clips. They arguably question her application of the methodology, but do not convince the Court that she committed any substantial errors. Evans explains that she followed her lab policies regarding labeling of evidence and measurements and that there are no "published requirements on the number of measurements that should be taken or on how these measurements should be taken." [697-5] at 3. This was a very simple analysis, which Palenik easily could have replicated to demonstrate that Evans must have applied her methodology incorrectly. Evans looked at the alligator clips side by side, measured their length, and counted their teeth. The correctness of Evans' "conclusions based on that analysis" is a "factual[] matter[] to be determined by the trier of fact." *Gopalratnam*, 877 F.3d at 781. To the extent that Defendant believes that Evans employed too great of a tolerance in evaluating the alligator clips, that may be brought out through cross-examination or Defendant's own expert. The Court therefore denies Defendant's motion to exclude Evans' testimony regarding the visual similarities between the Hinsdale blast site clips and the clips recovered from Defendant's apartment.

### C. Batteries [421]

In motion [421], Defendant seeks to exclude certain testimony concerning 9-volt batteries recovered from the Hinsdale blast site and the search of Defendant's apartment. The Hinsdale destructive device included one 9-volt RadioShack battery with silicone sealant on its base. See

28

[697-2] at 3; [697-3] at 6.  Two 9-volt Walgreens Heavy Duty batteries, one of which had silicone sealant on its base, were recovered from Defendant's apartment.  *Id.*  A report by Evans noted these similarities and described both the battery from the Hinsdale device and the two batteries from Defendant's apartment as being alkaline batteries.

Defendant seeks to exclude testimony that the battery "type" recovered from the Hinsdale depot was "a *type* of 9-volt battery known as 'alkaline,'" because "[t]he 9-volt battery type recovered from [Defendant's apartment] is a *type* of battery known as 'heavy duty.'"  [421] at 1 (emphasis by Defendant).  In response, the Government "represents that it will not seek to elicit testimony about the chemical composition of the batteries recovered from defendant's residence beyond what is provided by manufacturer markings found on those batteries, as no government expert engaged in any analysis to discern the contents of the two batteries recovered from Defendant's apartment."  See [697] at 8.  Based on this representation, the first part of motion [421] is granted.

Defendant also seeks to exclude testimony that one of the 9-volt batteries recovered from his apartment had text scratched off.  [421] at 2.  Defendant speculates that the Government may elicit testimony that the scratch marks were part of an effort to remove "tracking" information from the battery.  In response, the Government states that it does not anticipate eliciting testimony specific to "tracking" information being obscured on the battery.  The Government opposes this part of motion [421] on the basis that Defendant has "staked this challenge to admissibility solely on his disagreement with an anticipated government theory of the case," which is "not grounds for excluding evidence.  [697] at 8.  The Court will grant the second portion of motion [421], as well, because the Government does not claim that there is any potential relevance to the scratch marks.  See *United States v. Schmitt*, 770 F.3d 524, 532 (7th Cir. 2014) ("Of course, evidence must be

relevant to be admissible, but not all relevant evidence is admissible."). To the extent that the Government changes its mind and seeks to introduce testimony concerning the scratch marks, it is free to move for reconsideration.

**D.      Smokeless Powder and Ammunition [424]**

In motion [424], Defendant seeks to exclude testimony concerning smokeless powder and ammunition recovered from the Hinsdale depot and the search of Defendant's apartment. As to smokeless powder, which is also the subject of motion [745], discussed above, Defendant argues that at the Utah trial Evans admitted that she could "not legitimately claim any material recovered from the defendant's 2nd floor living area to be chemically or visually consistent with smokeless powder, much less with Alliant Co.'s Blue Dot model of double-base smokeless powder." [424] at 8. Therefore, Defendant maintains, the Court should exclude from trial any loose suspect smokeless powder recovered from Defendant's apartment and any testimony by Evans concerning her observations about those materials.

As explained above in relation to motion [745], Defendant misstates Evans' Utah trial testimony as well as the conclusions reached in her underlying investigative report. In her report and her Utah testimony, Evans made clear that her analysis concluded that particles recovered from the shop vac in Defendant's storage unit was visually consistent with Alliant Blue Dot smokeless powder and that the samples recovered loose in Defendant's apartment were visually consistent with the particles recovered from the shop vac. Evans did not report or testify that she tested each sample of suspected smokeless powder to positively identify it as Alliant Blue Dot smokeless powder. The Court will allow Evans to testify about the smokeless powder allegedly recovered from Defendant's apartment, in a manner that is consistent with her analysis and report.

To the extent that Evans seeks to go beyond or contradict the findings set out in her report (and there is no indication she intends to do so), Defendant's motion in limine is granted.

The Court next considers the ammunition recovered from Defendant's apartment. Defendant maintains that this evidence should be excluded because it was never examined by Evans or any other Government witness. The Government responds that even though it was not forensically analyzed, "[t]he presence of ammunition at defendant's residence is relevant to defendant's familiarity with and access to firearms." [697] at 14. The Court finds this explanation inadequate to conclude that the ammunition has any relevance to the charged crimes. Defendant is not charged with or claimed to have used firearms; rather, the only weapon involved in this case is an alleged pipe bomb. Referring to ammunition without tying it in any way to the weapon allegedly used in this case could confuse the jury. (Perhaps the ammunition seized is of a type that could be used to make pipe bombs; however, the Government does not elaborate.) Therefore, the Court rules that the Government will not be allowed to introduce evidence or testimony concerning other ammunition recovered from Defendant's apartment, unless and until it moves for reconsideration and convinces the Court that the relevance of the evidence outweighs the risks of jury confusion and undue prejudice.

### E.    Silicone [428]

In motion [428], Defendant seeks to limit testimony concerning silicone recovered from the search of Defendant's apartment and the Hinsdale crime scene. Amy Michaud, a forensic chemist/trace evidence examiner, analyzed the silicone. In particular, she examined white adhesive particles recovered from device components recovered from the Hinsdale crime scene. She also examined a tube of GE 100% Silicone, Silicone II, Kitchen & Bath®, which was also found in Defendant's apartment. In her report, Michaud concluded that white adhesive particles

recovered from device components recovered from the Hinsdale crime scene and 5 and 9-volt batteries and pliers recovered from Defendant's residence "were found to be consistent in appearance, chemical composition, and elemental composition" to a tube of GE 100% Silicone, Silicone II, Kitchen & Bath®," which was also found in Defendant's apartment. [697-9] at 4. At trial in the Utah case, Michaud explained that she reached this conclusion by conducting a visual comparison of these exhibits with her naked eye, a lighted magnifier, and a stereo microscope and found them both to be "white, opaque, fairly mat (sic) and fairly rubbery adhesives, or actually these are sealants" and found them to be visually consistent. [697-10] at 22. She also conducted an elemental comparison on samples of the adhesives taken from each of the exhibits by using a scanning electron microscope energy dispersive spectrometer, a device which determines the elemental composition of the materials. *Id*. at 23.

In motion [428], Defendant criticizes Michaud's report on three bases. First, Defendant assert that "Michaud was unable to conclude that a match exists between the physical properties for the white rubbery silicone material from the crime scenes of interest, to search warrant samples," because "an insufficient amount of sample from crime scenes prevented a reliable comparison result." [428] at 6 (citing Trial pg. 1263); see also [697-10] at 45 (pg. 1263 of Michaud's trial testimony). This misstates Michaud's testimony. She stated that she did "look[] at the physical properties"—she "poke[d] them to see whether they were resilient or rigid, things of that nature, were they bendable." *Id*. She also explained that she did not use a device to determine how elastic or plastic the silicone exhibits were; that was not part of her standard protocol because "the FTIR which [she] did would reveal some of the differences." *Id*. at 42-44. Defendant also does not suggest that an alleged failure to examine the "physical properties" of the

silicone exhibits would undermine Michaud's conclusion that they were visually consistent and had the same elemental composition.

Second, Defendant emphasizes that Michaud did not conclude that the silicone recovered at the Hinsdale depot necessarily came from the container of silicone recovered from Defendant's apartment. Defendant requests that the Government be "barred from testimony which implies that the silicone recovered from crime scene[s] could have originated from a branded container of silicone from search warrant." [428] at 8. The Government represents that it "will not elicit testimony or argue that the silicone on the exhibits originated from the specific GE tube of silicone found in defendant's residence." [697] at 16. The Court will hold the Government to its representation and grant motion [428] to this limited extent. However, it will not limit Michaud from opining on consistencies between the silicone found at the Hinsdale depot and the specific tube of silicone found in Defendant's apartment.

Third, Defendant criticizes Michaud for referring to the exhibits as "adhesive" rather than "silicone." He posits: "A jury might silently wonder, and understandably so, as to how a silicone from one location is 'consistent' with 'adhesive' from a different location, and a 'glue' from yet another location. This ambiguity leaves the 'consistency aspect' unidentified, forcing the jury to guess at what is meant. Both ATF analysts have agreed that silicone was the search warrant material which is counterpart to crime scene silicone. Therefore, the word 'silicone' should be used when government experts refer to the white stuff they found." [428] at 7. The Court will not police Michaud's use of terminology in such minute detail. She is free to explain what the relevant terms mean and why silicone might also be considered an adhesive. For instance, in the Utah trial she explained that an "adhesive" is "any material that can be used to bond two surfaces together," [697-10] at 10, and referred to the material "[w]ithin the tube" of GE silicone as an "adhesive."

[697-10] at 13, 20. To the extent that Defendant believes that Michaud's testimony may be confusing to a jury, he is free to explore the issue in cross-examination.

### III. Other Evidentiary Issues [614] and [716]

In motion [614], Defendant asks the Court to enforce its May 1, 2019 order, see [452], by requiring the Government to respond to his discovery request concerning "whether the government fingerprint work employed computer enhancements or corrections in the course of his development of prints on ATF instant case exhibit #15a." *Id*. at 2. In response, the Government represents that it has already provided all of the evidence that it was required to provide, which included Lewis' case file (reports, notes, email, chain of custody documents, evidence inventory documents, and photos); an additional copy of the photos taken by Lewis as part of his fingerprint analysis; and copies of his lab's accreditation guidelines. See [693] at 1-2; see also [452] at 4. The Government further represents that "[t]o the extent that Lewis used computer enhancements, it would have been noted in the case file." [693] at 2. Based on these representations, motion [614] is denied as moot.

In motion [716], Defendant "re-requests" Evans' March 3, 2020 lab report because he never received it. In response, the Government represents that it has sent Defendant another copy of the lab report. Therefore, motion [716] is also denied as moot.

### IV. Conclusion

For the following reasons, the Court: grants motion [421]; grants in part and denies in part motions [424] and [428]; and denies motions [334], [417], [418], [552], [555], [614], [714], [716], [745], [753], [763], and [811].

Dated: November 1, 2021

Robert M. Dow, Jr.
United States District Judge